*La Michoacana Natural, LLC v. Luis Maestre, et al.*
**U.S. District Court for the Western District of North Carolina**
**Charlotte Division**
**Case No. 3:17-cv-00727-RJC-DCK**

# EXHIBIT 3

## DECLARATION OF LAURA L. CHAPMAN

**Transcript of Motions Hearing**
**Before The Honorable Robert J. Conrad, Jr.**
**United States District Judge**
**May 31, 2019**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


LA MICHOACANA NATURAL, LLC,   ) DOCKET NO. 3:17-cv-727
                             )
        Plaintiff,       )
                             )
        vs.              )
                             )
LUIS MAESTRE and ADRIANA TERAN,)
                             )
        Defendants.      )
_____ )




TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
MAY 31, 2019










LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:


On Behalf of the Plaintiff:

        STEPHEN LEE ANDERSON, ESQ.,
        Anderson and Associates
        31285 Temecula Parkway, Suite 240
        Temecula, California 92592

        ALBERT P. ALLAN, ESQ.,
        Allan Law Firm, PLLC
        409 East Boulevard, Suite 201
        Charlotte, North Carolina 28203


On Behalf of the Defendant on Motion to Withdraw:

        SONNY THAI TRAN, ESQ.,
        Tran Law Firm
        4850 Old Pineville Road, Unit A
        Charlotte, North Carolina 28217


        LUIS MAESTRE, Pro Se
        15008 Statesville Road
        Apartment 88
        Huntersville, North Carolina 28078


        ADRIANA TERAN, Pro Se
        15008 Statesville Road
        Apartment 88
        Huntersville, North Carolina 28078


INTERPRETING:
        ENRIQUE ARTURO BOWSER

P R O C E E D I N G S

FRIDAY, MAY 31, 2019:

(Court called to order at 11:14.)

THE COURT: Good morning, everyone.

Would the attorneys present introduce themselves and tell me who you are representing.

MR. ANDERSON: Good morning, Your Honor. This is Stephen Anderson on behalf of the Plaintiff La Michoacana Natural, LLC, and its principal today is here with us, Rigoberto Fernandez.

MR. ALLAN: Albert Allan on behalf of La Michoacana Natural, Plaintiff.

THE COURT: Mr. Anderson, Mr. Allan, welcome.

MR. TRAN: Good morning, Your Honor. My name is Sonny Tran on behalf of the Defendants for right now, Mr. Maestre and Ms. Teran. They have made a desire to represent themselves back in February which is why I presented my motion for withdrawal. They are sitting behind me now with an interpreter/family friend Mr. Enrique Arturo Bowser.

THE COURT: Very well.

Mr. Bowser, are you performing interpretation services for the defendants at their request?

MR. BOWSER: Yes, sir.

THE COURT: And as needed?

MR. BOWSER: Yes, sir.

1          THE COURT:  If you would let me know if I am

2   discussing something that is difficult to be translated if you

3   need more time I will provide you with that.

4          MR. BOWSER:  Thank you, Your Honor.

5          THE COURT:  I have got at least three things in

6   front of me, Motion for Sanctions, Motion For Withdrawal, and

7   a Motion for Partial Summary Judgment, as well as I guess

8   combined with that, but possibly mooted by that is the motion

9   for a second preliminary injunction.  I would like to take

10  those things in order.

11         Mr. Anderson, be glad to hear from you on the motion

12  for sanctions.

13         MR. ANDERSON:  Thank you, Your Honor.

14         Looking back now it's been several months since that

15  was prepared.  As I recall, the purpose for the Motion of

16  Sanctions was, quite frankly, because of the repeated failures

17  of the defendants to cooperate and participate in discovery in

18  this matter.

19         The various rulings by Judge Keesler in which he

20  indicated, for example, that if they did not comply that they

21  would have to pay monetary sanctions those were mandatory, but

22  he said they would waive them for the time being if they could

23  comply.  We've had two or three other compulsion orders since

24  that time and we even extended voluntarily further time for

25  the defendants to respond to discovery including our offer to

1  withdraw the deemed admissions.  But yet, they still have

2  continually failed to comply.

3          And the other issue, as I recall, involved a wayward

4  or backdated envelope sent by Mr. Tran in which the documents

5  themselves were signed having been served the 11th of

6  February, although the cover letter and the envelope itself

7  indicated February 12th.

8          THE COURT:  Is what?

9          MR. ANDERSON:  It's February 12th.  The cover letter

10 inside the envelope and the envelope itself says

11 February 12th.

12         THE COURT:  Okay.

13         MR. ANDERSON:  So clearly that date wasn't correct.

14         And finally, the other thing if I'm not mistaken, it

15 flowed from Mr. Tran's Second Motion to Withdraw in which he

16 indicated that since he had been retained in this matter in

17 October that the defendants had failed to provide him with any

18 new information, yet he was able to convince Judge Keesler to

19 allow him to file a cross complaint.  And, of course, we

20 contend that without any additional facts, how could he allege

21 matters in a cross complaint that weren't there before.

22 Again, as I recall, that's precisely what we did in this

23 motion.  But, again, now that some time has gone by, to say

24 the least, I'm not nearly as hot as I was about it in

25 February.  I'm much more interested in progressing on to

1  motion 64, particularly.  Thank you for your time.

2           THE COURT:  Mr. Tran.

3           MR. TRAN:  Yes, Your Honor.  As far as the incorrect

4  address that Mr. Anderson received, I was just relaying the

5  address that the defendant provided to me as far as his most

6  current and recent or best mailing address and forwarded that

7  along.  There was no intent to misrepresent any addresses.

8           As far as the --

9           THE COURT:  While we're on the subject of addresses,

10 what are the correct addresses?

11          MR. TRAN:  The correct address should be -- it

12 should be 15008 Statesville Road, Apartment 88, Huntersville,

13 North Carolina 28078.

14          THE COURT:  And that's the address for which

15 defendant?

16          MR. TRAN:  Would like for all the correspondence to

17 be sent to.  Yes, Your Honor.

18          THE COURT:  All right.  And with respect to the

19 other items in the sanctions motion.

20          MR. TRAN:  Well, we feel that the Plaintiff's

21 counsel is misrepresenting the contents of what I mention in

22 my Motion to Withdraw.

23          I stated in my Third Motion to Withdraw that the

24 plaintiffs informed the defendants as early as October the

25 defendant would need to provide the undersigned with

1  additional evidence including, without limitation, the witness

2  names and contact information, addresses, so on and so forth.

3          Now, such statements cannot be reasonably construed

4  to mean that the defendants have provided their counsel with

5  no evidence to support their counterclaims but only that

6  the -- only that I had requested additional evidence for the

7  purpose of supplementing our initial disclosures and discovery

8  responses.

9          THE COURT:  And where in this docket is there any

10  discovery response at all?  I'm looking at a docket that goes

11  back to December of 2017 and the only litigation I see is with

12  respect to withdrawing as counsel.  I don't see any -- I see a

13  lot of attempts by the magistrate judge to acquire responses

14  to discovery and other requests.  I see no -- I see no

15  indication that that has ever been complied with.

16          MR. TRAN:  Yes, Your Honor.  I -- I came on board,

17  so to speak, at the -- around October of 2018.  And I do

18  recall that there were some discovery requests and responses

19  that were made last summer before I came on board.  And what

20  we were trying to do was obtain some additional information

21  for Plaintiff's counsel -- to respond to Plaintiff's counsel's

22  subsequent requests.

23          THE COURT:  So if you could point to me in the

24  docket where there's been any compliance with the orders of

25  the Court or the requests of the plaintiff for discovery I

1    would appreciate it because I am looking.  I can't find it.

2              MR. TRAN:  Your Honor, what I do have for the file

3    that I was -- inherited, it appears that around the 16th of

4    August there were some responses to plaintiff's first set of

5    interrogatories.

6              THE COURT:  The 16th of August of 2018?

7              MR. TRAN:  Yes, Your Honor.

8              THE COURT:  I have an order dated the 17th in which

9    there's an order compelling disclosure.

10             MR. TRAN:  It looks like --

11             THE COURT:  The order is mailed to the defendants.

12             MR. TRAN:  Yes, Your Honor.  It was mailed via U.S.

13   Mail.

14             THE COURT:  And I don't see any compliance with that

15   order.  There's a motion in September for sanctions because of

16   non-compliance.

17             But I don't see any compliance at all.  I don't see

18   any compliance with discovery or any of the court's orders in

19   this case from 2017 until the present date.  I don't see any

20   response, for example, for the Motion for Partial Summary

21   Judgment.

22             MR. TRAN:  Your Honor, may I consult with the

23   defendant?

24             THE COURT:  Sure.

25             I see that on February 28, 2019, the magistrate

1 judge ordered in response to a Motion for Sanctions for

2 Failure to Comply with Court Order and Stipulation concerning

3 Discovery.  That the defendants were directed to file a

4 response to Plaintiff's Motion for Sanctions; failure to file

5 would result in the relief being granted.

6     The "Defendants, individually, shall file a response

7 to Defendants' Counsel's Third Motion to Withdraw as Counsel

8 indicating their position on counsel's request and providing

9 complete contact information for each Defendant.  Failure to

10 file a timely response to the motion would lead to sanctions."

11     And that "Defendants were ordered to file responses

12 to Plaintiff's Motion for Sanctions Due to Defendants' Failure

13 to Comply with Court Order and Stipulation concerning

14 Discovery by March 12th.  Individually file responses to

15 Counsel's Third Motion to Withdraw."

16     And I don't see anything in the record with respect

17 to responding to that Court Order.

18     MR. TRAN:  Yes, Your Honor.  It appears that when

19 the defendants submitted their responses to Mr. Anderson,

20 first set of discovery requests on -- on or around August 16,

21 2018 --

22     THE COURT:  Are you talking about the tax returns?

23     MR. TRAN:  Interrogatories, and request for

24 production of documents, and request for admissions.

25 Apparently that they -- before I became involved, they, the

1  defendants, on their own submitted a response.  And I have a
2  certificate of service here that appears as they sent it via
3  U.S. Mail around August 16, 2018.
4          THE COURT:  Mr. Anderson, did you receive that and
5  what did you receive?
6          MR. ANDERSON:  Your Honor, going back to 2016 we've
7  had a number of motions.
8          THE COURT:  Oh, I think they're talking about
9  August 16, 2018.  Am I right?
10         MR. TRAN:  Yes.
11         THE COURT:  2018.
12         MR. ANDERSON:  Yes, I misspoke.  But just the same,
13 we had Judge Keesler have several compulsion orders since
14 then.
15         THE COURT:  Right.  So I'm talking about this
16 August 16, 2018.  What responses did you get to your discovery
17 requests, if any?
18         MR. ANDERSON:  Yes.  We did see some, but, as I
19 recall, I believe we have them in here if we need to, but I
20 think we've attached some of those to the motions.
21         As I recall, they generally were argumentative and
22 non-responsive and often ended with things like "We'll prove
23 that in court" or other statements that just did not respond
24 to the discovery requests themselves.  That's why we brought
25 it back to the magistrate judge and he later found those were

1    inadequate and ordered them to supplement and/or provide

2    complete responses.  And I believe that -- again, we've had

3    two or three orders since then on the same subject.

4           But we never received responses for the requests to

5    admissions.  What we did receive here August -- okay.  I have

6    something October 19th of '18.  That was just initial

7    disclosures that were also inadequate.

8           It's been somewhat difficult because as I recall

9    that may be between the last attorney and Mr. Tran when they

10   sent them themselves with a cover letter from Ms. Teran.

11   There were a couple of tax returns attached, but none of the

12   documents were either identified to respond or correspond to

13   any of the document requests and none of the interrogatories

14   were completely answered.  As I said, they were often

15   argumentative or non-responsive entirely.

16          There is a declaration on that subject in my Motion

17   for Sanctions, Your Honor, I believe, the initial one.

18          THE COURT:  Document 64-10 appears to be a statement

19   by Ms. Adriana Maestre and a statement by Luis Maestre with an

20   attached Profit and Loss statement for January 16 to

21   December 31, 2016, a trial balance, general ledger for that

22   time period and tax returns.

23          That appears to be the sum total of the discovery

24   responses in this case.  And it seems to be wholly inadequate

25   with respect to the orders, the various orders of the

1 magistrate judge, including the one I mentioned document
2 number 60.

3        Mr. Tran, where in the docket is there any
4 indication that the request to admit filed by the plaintiffs
5 have been responded to in any way by the defendants?

6        MR. TRAN:  Your Honor, I don't see it on the docket.
7 But I do see, I guess, in our file that there was a response
8 to the requests for admissions.  I'm just not certain -- I
9 can't confirm right now how and when it was submitted.  But
10 there were some responses to their request for admissions, and
11 I have a couple of copies here to see maybe before I got
12 involved if Mr. Anderson's team has received these responses
13 to their RFAs.

14        THE COURT:  Mr. Anderson, have you received any
15 responses to your request to admit?

16        MR. ANDERSON:  Not that I'm aware of, Your Honor.  I
17 don't have any in my file.  And as the Court may note, Judge
18 Keesler ordered that both myself and Mr. Allan be served with
19 those.  And Mr. Allan has attested that he has not received
20 any such documents either.

21        THE COURT:  What order of Magistrate Judge Keesler
22 are you referring to?

23        MR. ANDERSON:  That was the one following -- here it
24 is.  It was the one following the revised pretrial case
25 management plan.

1        THE COURT:  What's the docket number?

2        MR. ANDERSON:  Fifty-four, I believe.  I'm taking a

3  look real quick -- 54 -- no, that's not the one.  Also it's a

4  stipulation, Your Honor.  We had filed a stipulation in this

5  case, I believe that's number 50, in which the other side

6  signed and that said they would submit written responses to

7  myself and Mr. Allan.  I believe that's document 50.

8        THE COURT:  It is.  And has there been anything

9  filed with respect to that?

10        MR. ANDERSON:  No, sir.  Just my own notice of

11  non-compliance.

12        THE COURT:  Right.

13        MR. ANDERSON:  It's also in Number 57, Your Honor.

14  That's the order I was referring to, page 2, numbered

15  paragraph 1.

16        THE COURT:  In that order the magistrate judge

17  refers to the stipulation in document number 50 which was

18  filed on February 1st.  And in that stipulation the defendant

19  is required to serve Plaintiff's attorneys, Mr. Anderson and

20  Mr. Allan, with full and complete responses, without

21  objections, to the First Set of Discovery previously compelled

22  by the Court.

23        And then there are listed Plaintiff's First Set of

24  Interrogatories to Mr. Maestre.

25        Plaintiff's First Set of Request For Production of

1  documents to Mr. Maestre.

2          Requests For Admissions, and Plaintiff's First Set

3  of Interrogatories to Adriana Teran.

4          Magistrate Judge Keesler, in that order advises, or

5  tells Mr. Tran to "advise his clients that continued failure

6  to fully participate in discovery in this matter will likely

7  lead to sanctions that might include dismissal of their claims

8  and/or a judgment in favor of Plaintiff."

9          So Mr. Anderson, my question to you is, what if

10 anything have you received from the defendants with respect to

11 the items set forth in the stipulation document number 50 as

12 reflected in Judge Keesler's order Number 57?

13         MR. ANDERSON:  Nothing prior to the last motion

14 being filed.  I understand that sometime in April of this year

15 a FedEx package came in from Mr. Maestre.  However, frankly, I

16 did not even open it or look at it because we already had

17 motions for summary judgment pending, several orders that they

18 respond to the motion to withdraw and, frankly, we couldn't

19 take a deposition at that point so there really wasn't any

20 point in reading it.

21         But we did receive some additional documentation.  I

22 just haven't considered it for purposes because, quite

23 frankly, if I may, the deal was that if they got us the RFA

24 responses by a date certain they would be deemed withdrawn

25 from the admissions.  But since they didn't comply with that,

1 the admissions still govern and that's the basis in part for
2 our motion for summary judgment that they admit that basically
3 all of the allegations in the case and that their affirmative
4 defenses are not adequate.

5        THE COURT: But you're telling me as counsel of
6 record in this case you received some information you didn't
7 even look at it?

8        MR. ANDERSON: There was a FedEx package, again, it
9 was not sent to Mr. Allan. It was sent apparently by
10 Mr. Maestre directly. It was not initially delivered to my
11 office, but we did see it, and when I got it, I frankly didn't
12 know what to do with it.

13        THE COURT: Well, one thing you could have done with
14 it is look at it so that you could tell the Court what it was
15 so the Court would have that information.

16        MR. ANDERSON: I did go through it.

17        THE COURT: Wait, don't interrupt me.

18        MR. ANDERSON: I'm sorry.

19        THE COURT: I don't want to have to tell you that
20 again.

21        You filed a motion asking for relief from this
22 Court. If this Court has questions for you, you will listen
23 to it and try to answer those questions.

24        So one of the things you could have done is read
25 what you received.

1          MR. ANDERSON:  I --

2          THE COURT:  You've done it again.  You will not

3    speak until I am done speaking.  If I have to tell you a third

4    time, I will ask Mr. Allan to conduct this from this point

5    forward.

6          This is just -- so let me start a third time with

7    you, Mr. Anderson.

8          You could have read what you received.  You could

9    have been aware of that so that when I asked you these

10   questions you could tell me the answers to them.

11         That's one thing you could have done.  But

12   apparently you didn't do that.

13         MR. ANDERSON:  Sir, I misspoke.  I didn't say that I

14   didn't read it.  It's just -- it didn't make sense.  They

15   weren't responsive.  They were a group of documents, some were

16   papers, some were pictures, but they did not correspond to any

17   discovery requests.  There was no titles or covers or Bates

18   stamps.  It was just a stack of paper that frankly I couldn't

19   make heads or tails of what it was supposed to be.  It wasn't

20   identified.  It wasn't certified, and it wasn't signed.  It

21   wasn't sent by an attorney.

22         All I know is I got a package of paper in a FedEx

23   envelope that was not complying with the court order that

24   we've been waiting for.  We had three, four, five court

25   orders.  I don't know what I can do.  When Pro Person sends me

1   a stack of paper, half of it was like phone book ads and
2   things.  It was just no value in this case.
3            THE COURT:  All right.  I'm directing you to tender
4   under a separate pleading what you received in April of this
5   year.  Is that your statement to the Court, you received
6   something in April?
7            MR. ANDERSON:  It would be after March 15th, and
8   approximately around April 1st.  We moved our office on
9   March 15th.  That's the last time I filed in this court around
10  the 29th.  So it came in around probably the 30th of March.
11  Just after I filed our last motion in this case, and again, it
12  was not signed by any attorney or any party.  It was just a
13  FedEx --
14           THE COURT:  When you're talking to me, you're going
15  to stand up --
16           MR. ANDERSON:  I apologize.
17           THE COURT:  -- and address the Court.
18           What were you saying?
19           MR. ANDERSON:  It was just a FedEx package that had
20  been addressed to my office, that again, I think we even had
21  trouble identifying what file it went to.  But we figured it
22  out based on the return envelope.  There really wasn't
23  anything in there that was pertaining to this -- it wasn't a
24  response to any motion.  It wasn't a response to discovery,
25  and it certainly wasn't a response to request for admission

1　that had been outstanding since June of 2017.

2　　　　　THE COURT:  And your indication to the Court is that

3　it was sometime after you filed your motion for summary

4　judgment March 13, 2019.

5　　　　　MR. ANDERSON:  Most definitely.  Because we moved

6　our offices on the 15th and advised the Court of that.  And

7　several days later I got a phone call from FedEx saying there

8　was an envelope there.  And I later called, I spoke to Luis

9　Maestre and explained that he sent it to the wrong address.

10　He said he would resend it, and it showed up about seven to

11　ten days later, which I expect is around the 30th of March.

12　　　　　THE COURT:  Mr. Tran can you -- do you have any

13　response to anything that we have been discussing with respect

14　to the information provided in this case by the defendants to

15　Mr. Anderson?

16　　　　　I see that Magistrate Judge Keesler extended time

17　until March 28th to respond to Plaintiff's second set of

18　discovery requests.  Is there any indication that that order

19　was complied with?

20　　　　　MR. TRAN:  I -- Yes, Your Honor.  I double checked

21　my files and quickly conferred with the defendant.  And I'm

22　not quite sure of what happened, what they did on their own

23　after I filed my first motion to withdraw in mid February.  At

24　that time the defendants did indicate that they, for whatever

25　reason, they departed from what we had initially thought was a

1   path towards some type of resolution or settlement.  So that's

2   why I filed my motion in mid February to withdraw because

3   there was a fundamental disagreement in how we wanted to carry

4   this matter out.

5           The defendants did indicate that they would retain

6   possibly separate counsel or translator that -- whose vision

7   would align with theirs and started to, I guess, proceed with

8   trying to respond with all the deadlines that we did

9   communicate -- that my office did communicate to the

10  defendants, and based on what I've seen so far, I'm not sure

11  to what extent that they did or didn't.

12          THE COURT:  I do see where the defendants have filed

13  a pleading with the Court, subsequent your motion to withdraw,

14  recognizing their responsibility to provide information and

15  documents to opposing counsel because of the Judge.  But we do

16  not have the information yet which was filed the fifth day of

17  March, document number 63.

18          I have considered this docket at length.  I have

19  wrestled with the non-compliance as demonstrated for over a

20  couple of years with respect to the defendants' obligations in

21  litigation, both as a named party defendant, as well as a

22  cross-claiming plaintiff in which the defendants invoked

23  relief from this Court in their counterclaims.  And I find

24  that this record is woefully deficient in terms of compliance

25  with numerous discovery and compulsion orders of the

1    magistrate judge, and a total abdication of responsibilities

2    as a litigant in this court to prosecute their own claim or to

3    respond appropriately to the numerous discovery requests,

4    including requests for admissions, orders to comply, warnings

5    of sanctions.  And the defendants have been totally

6    contemptuous of their obligations to comply with Court orders,

7    to comply with discovery, to respond to discovery requests.

8         Therefore, I find that the plaintiff's Motion for

9    Sanctions is a valid one, and that the appropriate relief for

10   the failure to comply with the obligations under Rule 26 and

11   other obligations to prosecute claims and be responsive to

12   Court orders is to strike the defendants' amended answer and

13   counterclaims, and to find as established the requests to

14   admit that have been filed by the plaintiff.

15        I think the defendant has been, to a certain extent,

16   coddled for a long period of time in the hopes that at some

17   point they would recognize their obligations with respect to

18   discovery and to comply with the orders of the Court.  They

19   have failed to do that, and the Court will, as a response to

20   that conduct, strike their amended answer and counterclaim,

21   and deem admitted the request to admit.

22        Mr. Tran, I will be glad to hear from you if there

23   is anything further you wish to say with respect to your

24   motion to withdraw.

25        MR. TRAN:  Yes, Your Honor.  Back in February, mid

1   February, as -- when I got involved the goal was, I thought

2   there was a chance for both sides to amicably resolve this

3   before getting to this point.  I think Mr. Anderson and I had

4   a -- lots of lengthy discussions to find some middle common

5   ground to resolve this before we got to this point today.

6          And I think we got close sometime in February, and

7   that's when the defendant, I guess, changed their outlook or

8   how they wanted to move forward in this case.  It was a little

9   bit discouraging for me because I put a lot of time and effort

10  in trying to bridge the two sides together to find some type

11  of middle ground.

12         But I have shown good cause to withdraw.  The

13  client, the defendants here have consented, and we filed that

14  with the Court.

15         THE COURT:  The Order I referred to filed March 11,

16  Defendants' Response to Third Motion to Withdraw.

17         MR. TRAN:  I'm sorry, Your Honor.

18         THE COURT:  The consent is that document you're

19  talking about, is that --

20         MR. TRAN:  That would be docket number 53 filed on

21  February 15th, where the defendants signed and consented

22  allowing my withdrawal.

23         Furthermore, right around that time was when it

24  became apparent that the defendant and I had to -- had a

25  fundamental disagreement on how to move forward.  It was

surprising to me and very discouraging at the same time.  And
then also there was some, I guess, a financial, unreasonable
financial burden for me to continue on when the client, the
defendants here, were falling behind on their fees to the law
firm.

I believe as of February the defendant had
approximately $2,300 in outstanding legal fees that doesn't
even account for the $1,200 in discounts that I provided to
try to help the defendant along because I felt somewhat
optimistic that both sides would reach some type of compromise
in a settlement agreement.  And Mr. Anderson and I did talk at
length about the terms in trying to finalize it, and I thought
we were very close.

Also at this point I don't feel like there would be
any type of undue delay.  Up until my motion to withdraw, the
defendants have, to the best of their abilities, represented
themselves, tried to represent, and indicated to me and my
office that they would represent themselves and not want our
involvement due to our fundamental difference.

Their business is not an LLC or a corporation.  They
are sole proprietors so therefore they would not be
representing another entity.  They would be, in essence,
representing themselves.

I did file, and several on behalf of the defendant,
various documents, motions, briefs in opposition to motions,

1  and discovery requests -- or responses to discovery requests.

2  But again, back in February that's where the defendants and I

3  had some fundamental differences of opinions about the proper

4  course of action to take in this case.

5          And that's all I have for now, Your Honor.

6          THE COURT:  I will grant the motion to withdraw.  I

7  find that the defendants have indicated their consent to that

8  in a filed pleading, are here today, can represent themselves

9  from this point forward.

10          Mr. Tran, I would ask you to remain in court for the

11  balance of the hearing to render any assistance the defendants

12  wish to ask your advice, if you are comfortable providing that

13  advice.  I am not telling you should or shouldn't.  Your

14  motion to withdraw has been granted.  But for convenience

15  sake, I would ask you to stay present in the courtroom for the

16  pendency of the hearing.

17          MR. TRAN:  That won't be a problem, Your Honor.

18          THE COURT:  And so at this point you are relieved of

19  your duties.

20          And Mr. Maestre and Ms. Teran are present here, and

21  have indicated their desire to represent themselves, and they

22  will do so from this point forward in the hearing.

23          Mr. Anderson, I will be glad to hear from you on

24  your motion for summary judgment.

25          Before you begin I would like to make sure that I am

1  on the same page as you.  Apparently you have moved for

2  partial summary judgment.  And if I'm counting up the counts

3  correctly, it's on Counts One, Two, Three, Four and Seven.

4  The first four being the Lanham Act causes of action, and the

5  seventh being the North Carolina Fair and Deceptive Trade

6  Practice Act Claim; am I right about --

7            MR. ANDERSON:  Yes, Your Honor.

8            THE COURT:  -- the extent of your motion?

9            MR. ANDERSON:  We've withdrawn the copyright claim

10  because it would require another wrinkle in the filing,

11  meaning another, you know, more issues and more arguments.

12  Quite frankly, we just felt that if we could get some partial

13  summary judgment we would just dismiss that cause of action.

14            THE COURT:  So that cause of action, give me the

15  complaint number.

16            MR. ANDERSON:  I believe it is number 4.  I'm

17  checking right now, sir.

18            Third is the dilution.  We did not seek that, I

19  believe.

20            And the fifth is copyright.

21            THE COURT:  Copyright is fifth.

22            The sixth cause of action is the North Carolina

23  Statutory Trademark cause.  I don't believe that is argued in

24  your brief.

25            And then the eighth is -- what is the eighth?

1          MR. ANDERSON:  I don't believe we mentioned the

2    eighth either.  It was just the seventh because it's a state

3    registered trademark as well.

4          THE COURT:  So I will be glad to hear from you on

5    causes of action One through Four and Seven.

6          MR. ANDERSON:  Thank you, Your Honor.

7          Well, in this case my client owns a federally

8    registered trademark that consists of the words "La

9    Michoacana" 100 percent traditional and in female character.

10   They've had four or five marks that have been pending at the

11   USPTO since 2006.  They are currently pending registration,

12   after all these years.

13         My client also, as you know, owns nine state

14   registrations for the words "La Michoacana," there are three.

15   For the design of an Indian girl there are three, and for the

16   combined mark, the words "La Michoacana, ES Natural," and an

17   "Indian girl," there are also three.

18         When I say "three," I'm referring to the goods and

19   services being, as I recall, ice cream, Class 30 for the ice

20   cream, Class 35 for the retail stores services, and Class 43

21   for restaurant services, if I'm not mistaken.

22         My client, in particular, the gentleman sits behind

23   me, Rigoberto Fernandez, began -- as you may know from reading

24   the brief, he's the great nephew of the creator of the La

25   Michoacana brand, who in 1942 came down a mountain in Mexico

with burro carts carrying ice pack, went to the middle of

town, mixed it into with milk and fresh fruits, opened up the

very first one in a little town called Tocumbo, Mexico, in the

State of Michoacan.

THE COURT:  So the history is adequately set forth

in the briefing.  Tell me with respect to each element of the

Lanham Act cases why you believe summary judgment is

appropriate.

MR. ANDERSON:  Well, of course we have a registered

mark.  That would indicate that it's got prima facia validity,

as well as the state marks.  And the pending marks, again, we

have senior common law rights.

Mr. Fernandez opened his first store in Florida in

1999, grew it to about 17 stores in Florida before he moved

here in 2014, has since opened three stores here.

He has become very well known in the local

community.  It's also a very well known national brand.  But

more importantly it's an international brand that harkens back

to Mexico.

As I understand it from the documents that I have

received and the information I have received from the

defendants, sometime in 2015 I happened to be here in

Charlotte.  Mr. Fernandez and I went to the store before it

was opened on Concord Parkway.  I held up a business card and

took a picture of the signage which was absolutely identical.

1          We sent a cease and desist letter.  There were still
2  paint cans on the floor.  And we said, "Please do not open up
3  an outfit that would interfere with my client's right to do
4  business exclusively here in the state."  We were ignored.
5          THE COURT:  That was in December of 2015?
6          MR. ANDERSON:  That's correct, sir.
7          And it was about a year later that I think we
8  brought this case against the defendants.
9          THE COURT:  I think it was actually two years later,
10 if I'm not right.
11         MR. ANDERSON:  That may be correct.  Again, there
12 were a number of other, sort of, issues going on at that time.
13 But we filed the case in Florida.  We were successful there,
14 very similar facts.  Came over here, and this case has just
15 taken a lot longer than we all anticipated.
16         At the motion for summary judgment, I think this
17 Court may recall, we demonstrated triable validity of the
18 claims.
19         THE COURT:  Are you talking about the preliminary
20 injunction hearing?
21         MR. ANDERSON:  Yes, sir.  That was, I believe, it
22 was a year ago today.  As a matter of fact my plane indicated
23 it was a year ago today, that is, June 1st of last year.  I
24 came in on May 30th.  I thought that was strange.  I flew the
25 same day.

1         Anyhow, in this case my client has senior common law
2    rights here in the State of North Carolina going back to 2014.
3    He's got registrations going back to 2014.  Sometime beginning
4    of 2016 these folks began copying it, that is, the brand.
5    They use the same tag lines, the same color.  Again, an
6    absolute knockoff of a specific design --
7         THE COURT:  So what has changed, if anything,
8    between the preliminary injunction hearing last year and
9    today?
10         MR. ANDERSON:  Good question.
11         The first thing we saw was that in as late as
12    October of last year the defendants were continuing to use
13    tags and logos that say "Paleteria La Michoacana" sometime
14    between October and November they changed it to "Paleteria La
15    Mexicana."  We did not feel that was sufficiently
16    distinguished.
17         Also, as the Court has been advised, Mr. Tran
18    advised me in February of this year that the defendant owned
19    an additional four domain names that he had not disclosed
20    previously, that each contained the names "La Michoacana."
21    Two of them were dot MX, meaning they had dot com, dot Mexico.
22    One I believe was a dot com in the U.S.  They're listed in
23    here.
24         But as I understand it, shortly after the
25    preliminary injunction was issued they took down two signs.

1   They left a few, it took us quite a while to get them to take

2   down the remainder.  And again, we virtually had no

3   cooperation with discovery.  And it's been like pulling teeth

4   to get them even to remove it from their invoices.

5           That is, if you buy an ice cream at their store you

6   will get a receipt that says "La Michoacana" or according to

7   Mr. Tran it now says "La Mexicana."

8           But again, we still consider that to be infringing,

9   confusingly similar designation for the same identical goods.

10          One other thing important to note, my client

11  expanded his third store in the Concord area.  So they have

12  gotten actually a little closer.  They used to be as far apart

13  as 12 miles, now I think they're about 2 miles apart, the

14  latest location.

15          There has been considerable dilution here in this

16  state.  As I indicated earlier, my client's trademarks have

17  moved forward at the federal level and have been approved.

18  We're just continuing to wait and see those get registered.

19          But we were able to get one registered earlier this

20  year, and I identified that in the motion.

21          It's the La Michoacana an Indian girl design.  It's

22  just a derivative of this one.  She is sitting on a swing.

23  That's registration Number 5143039.

24          THE COURT:  Talk to me about your damage claim.

25          MR. ANDERSON:  Well, as the Court may be aware,

we're seeking damages, the maximum under the Cyber Squatting
Act of $100,000 per domain times five domains owned by the
defendant.

Alternatively and/or in addition, we're seeking to
recover defendants' profits obtained pursuant to the Lanham
Act. As it indicates, if plaintiff can demonstrate the
profits it then becomes the defendants' burden to show any
offsets and costs it proved in the sale. Because we've seen
none of those, we can only go on the documents. Based on the
documents that we have, we have calculated to the best of our
ability the range of possible damages.

According to their, again, very questionable tax
returns, they also have inconsistencies within them, and the
documents signed by Ms. Teran and Mr. Maestre, which the Court
identified was docket 64-10, indicates that they made
somewhere between 66 -- $62,616 and $500,000 during the
roughly 3 year period between December 15 when they started
and December 18, which was last time we got any documents from
them.

And during that time it shows that they sold at
least 500 and -- about $535,000 worth of infringing goods.
And without any offsets, if the Court were willing to treble
as the North Carolina statute requires, that would be damages
in excess of $1.5 million.

I admit, under the circumstances, quite frankly, we

1   don't want to take that kind of money from the defendants.  We

2   never did.  We always offered them an opportunity to get out

3   the door a lot cheaper.  But I cannot calculate what their

4   damages are without their cooperation.  But the information

5   we've seen shows that they made at least 500 -- it's $534,958.

6   So we call it $535,000 in a 3 year period that they admit to,

7   and of course the five infringing domain names.

8           We're also requesting costs and attorneys fees

9   incurred in this case because we believe it's an exceptional

10  case.  We believe it is so because not only did the defendant

11  fail to comply with the court order indicating that he was

12  enjoined, but I haven't even mentioned the trouble online.

13  They had a software program translated in five languages

14  available on Apple and Google in which they were using the

15  mark.  And part of it provided biographical detail about their

16  store and the individuals, and part was a coupon buy six get

17  the next one free app.  We're still not sure where that came

18  from or what happened to it.  That was a pretty significant

19  issue.

20          Finally, without a doubt, after this case was

21  brought, after the defendant was aware of this action, he went

22  and bought four more domain names that directly infringed

23  ours.  He actually went out after the case and attempted to

24  sell one of the domain names to a man in Panama for $50,000,

25  and he listed it for sale on a domain auction site for $85,000

1  after this case was pending.  So certainly those constitute

2  bad faith.

3          And finally, with respect to bad faith, as the Court

4  is aware, they maintained addresses that were absolutely bogus

5  on the registrar.  That is the domain registrar showed their

6  address was named Made Express at a PO Box in Statesville that

7  was incomplete and differs from any address that they provided

8  here.

9          The Article 27D of the U.S. Code indicates Cyber

10  Squatting bad faith can be found when you provide false

11  registry information.  When you use a domain name in a way to

12  infringe the owner's rights or divert traffic of the internet

13  to a third party or their own site.

14          Quite frankly, just about six out of eight potential

15  rungs of bad faith were blatantly demonstrated, including

16  making at least two offers to sell these domain names for well

17  over 40,000, 85,000, which we believe therefore warrants the

18  $100,000 per domain name that was granted in the famous

19  Pinehurst case here in North Carolina.

20          Was there anything else the Court would like me to

21  address?

22          THE COURT:  Your claim for damages with respect to

23  January 1, 2018, to the present time, what evidentiary support

24  do you have for that?

25          MR. ANDERSON:  The smattering of documents that we

provided -- that were provided by Mr. Tran, they were just two
weeks of sale in October that showed roughly, I don't know, a
couple hundred dollars. But even at that rate for the given
time, because the store is still open today, however, you
know, again, we're having trouble trying to determine what
types of damages because very frankly, in throwing a bone to
the defense, we just don't want to take a piece of every ice
cream they make. We just want them to stop using it, and we
want to get to recover the damages for the harm caused to my
client.

We would never intend to put them in the poor house.
But to the extent that they have, and I mean this, if it
weren't for the trademark no one would go to their store. The
ice cream is not that unique. It's the brand. It's like
Starbucks. If I hold up a cup of coffee, it's a 50-cent cup
of coffee until I go to Starbucks it's a $5 cup of coffee and
people will line up for it.

So frankly, the only reason they have been using it,
the only reason they have been using our domain name, the only
reason they use our signage is to capitalize on the fame and
goodwill that my client and his predecessors have spent four
generations building. Thank you.

THE COURT: Mr. Maestre or Ms. Teran, is there
anything you wish to say or be heard from at this time in
response?

1           If you wish to talk to me in English, fine.  If you

2    wish to give your remarks in Spanish and have the

3    interpreter -- and, sir, what is your name again?

4           MR. BOWSER:  Enrique.

5           THE COURT:  Enrique?

6           MR. BOWSER:  Yes.

7           THE COURT:  You can do it that way.  Whichever works

8    best for you.

9           MR. MAESTRE:  Thank you, Your Honor.  Thank you so

10   much.

11          In the first time I come in this court, I come in a

12   lot intimidation to Mr. Anderson because one day before to

13   come in this court he come into looking for me on the -- in my

14   place, ice cream shop in Concord, very angry and intimidation

15   to the employee, intimidated to the employees.  Because

16   employee knows authorization for -- he looking for me, and the

17   employee say, I don't know where is Luis.  The camera

18   recording when Mr. Anderson say the employees and the

19   restaurant about 9:00 a.m, the restaurant not open.  He opened

20   the door with no authorization.  He go inside and say, where

21   is Luis?  I don't know.  Mr. Anderson say "fuck you" and what

22   he say the --

23          MR. BOWSER:  Middle finger.

24          MR. MAESTRE:  Yeah, middle finger to the employees,

25   say, "Luis I'm fired to this restaurant."  I'm very nervous

1  when I look in the criminal record.  The employees very
2  nervous too.  When after this -- after this day and coming
3  here, very nervous to Mr. Anderson.  He's one person -- he's
4  very nice person here in the court.  But he's very terrible
5  person when coming to looking for me in the Concord place,
6  restaurant.

7          So I'm fine right now.  I explain, give me
8  opportunity, Your Honor, to explain the situation.  It is
9  coming to 2008 I open one little business in the Sweet Flea
10  Market in 2008.  I sell Mexican candies, it's no corn,
11  popsicles, and put with La Linda Michoacana, and I have
12  document to Your Honor -- the manager to the restaurant -- the
13  manager to the flea market.  I don't know it's possible you
14  can read it.  When any store for the business popsicles, snow
15  cone, mini donuts, and the flea market (indiscernible) in 2008
16  before to the La Michoacana coming to Charlotte.  I have no
17  idea if North Carolina had other place name Michoacana.  But I
18  living in North Carolina for 2001.  A lot of time living here,
19  but I open a very small business and the flea market Union
20  County in 2008 and put the La Michoacana.

21          After this, Your Honor, my customers -- a lot of
22  customers come into Concord City.  The customers tell me,
23  "Hey, you Popsicle, you snow cone, it's very good.  Why you no
24  open one small business for visit every day or whatever, not
25  only weekends."  Because in the flea market open only Saturday

1    and Sunday.  I'm talking to my wife, "Hey, it's good idea open

2    one business in Concord."  When I'm saving money -- when I'm

3    ready to, about 2 year or 3 year after in 2016, and I need

4    investigate who is the owner to the La Michoacana, the logo

5    and the name.  Who is the owner?  Because I like the little

6    lady.  My idea is put the little lady on the business, in the

7    front.  I contact somebody in Mexico and the name is Alejandro

8    Andreish.  Alejandro Andreish is the guy creation.

9                MR. BOWSER:  He created the logo.

10               MR. MAESTRE:  He created the logo.  He talked to me,

11   Luis, I created the logo --

12               MR. ANDERSON:  Excuse me, Your Honor.  We have to

13   object on hearsay grounds to this testimony about some third

14   party in Mexico making allegations of some sort.

15               THE COURT:  Overruled.  I'll hear from you.

16               MR. MAESTRE:  And Alejandro tell me, I have the

17   phone number to California -- Modesto, California.  The owner

18   to the logo and the name Paleteria La Michoacana is in

19   Modesto, California.  You need to contact this company.

20               Okay.  Thank you.

21               I'm calling to Modesto, California.  The name

22   company is Paleteria La Michoacana.  I look on the website.

23   Everything perfect.  You look at the --

24               MR. BOWSER:  So he was aware about the little doll

25   at the website.  It was registered.  So he also asked the

1   manager Lorenzo Berretta who is in charge of the sales and

2   distribution for this company in Modesto, California.

3              MR. ANDERSON:  Excuse me, Your Honor.  He's neither

4   translating.  He just started speaking English on behalf --

5   now we have this guy testifying.

6              THE COURT:  What's the objection?

7              MR. BOWSER:  I'm explaining the situation.

8              MR. ANDERSON:  No foundation.  It's pure hearsay.

9              THE COURT:  Overruled.  Goes to state of mind.  I

10  will be glad to hear from you.

11             MR. ANDERSON:  For the record --

12             THE COURT:  I've ruled.

13             MR. MAESTRE:  Sorry, Your Honor, sorry.

14             Lorenzo Baraza.  Lorenzo, I'm sorry, I'm Lorenzo and

15  he's the manager, okay, the original manager.  He say, I'm

16  living in Concord, North Carolina.  I'm living in North

17  Carolina, and I have opportunity to open one restaurant, one

18  restaurant, Mexican grill, but I need to try to sell popsicles

19  and ice cream.

20             Lorenzo, is any problem if I put up the little lady

21  in the front?  He say me for -- by phone --

22             THE COURT:  So in your mind in 2008 you felt free to

23  sell the things that you were selling?

24             MR. MAESTRE:  Yes.

25             THE COURT:  Let's fast forward to 2015 you get a

1   cease and desist letter from the plaintiffs.  At least at that

2   point you're aware that somebody objects to your selling in

3   the way that you've been selling.

4          MR. BOWSER:  (Translating.)

5          Before the whole situation, yeah, he was fine

6   selling it.  He had authorization until 2014 when he decided

7   to open the business.

8          MR. MAESTRE:  Lorenzo say, "It's no problem because

9   the company is no right now in North Carolina.  You can use

10  it.  No problem with."

11         "Okay.  Oh, thank you, Lorenzo."

12         Include the lady.  When after Lorenzo arrived to

13  working the original Michoacana, I received the papers to

14  Mr. Anderson.  I read the paper.  I contact, again to

15  Mr. Lorenzo.  "Lorenzo, what happened?  I received one paper

16  saying he stop to use it, the little lady.  Please tell me

17  this lady is for the Modesto, California, company or maybe the

18  owner here in North Carolina?"

19         He said, "No, Luis.  Go to the website, Washington,

20  DC.  I look in everything.  The Court, the big Court in

21  Washington, all trademark -- Federal trademark for all United

22  States.  The owner is only La Paleteria Michoacana in Modesto,

23  California."

24         I'm thinking, well, this company -- this company

25  said original owner to the lady and the name, so I am relax.

1   Maybe people, I don't know what happened, but I'm talking to
2   the original owner.

3           Right now, Your Honor, this company here right now
4   in North Carolina, this company is right now put the research
5   with this logo and the name for about 125 supermarket,
6   restaurant, barber shop, he put everything.  I don't know if
7   Mr. Anderson had --

8           MR. BOWSER:  He knows if he's aware of that and is
9   he gonna go up against all those?

10          THE COURT:  What Mr. Anderson is going to do or not
11  going to do with respect to somebody else is not before this
12  Court.

13          MR. MAESTRE:  All right.  So now, Your Honor, this
14  company Paleteria La Michoacana is distribution --

15          MR. BOWSER:  Is distributing.

16          MR. MAESTRE:  Distributor the popsicles come into
17  the logo on the side and the logo say AR --

18          MR. BOWSER:  The trademark.

19          MR. MAESTRE:  Trademark.  I go see Wal-Mart sells
20  this, Sam's Club sell this, a lot of supermarket, Latino
21  supermarket right now sell this.

22          On the windows -- on the windows to the supermarket
23  have the big lady outside the window say "Paleteria La
24  Michoacana sell here."

25          The lady, big lady, this lady, same lady, it's in

1  the window to the all supermarket right now, Latino
2  supermarket.

3  So, Your Honor, I'm 100 percent the company Modesto,
4  California, Paleteria La Michoacana is the owner to the name
5  and the little lady.  Mr --

6  THE COURT:  You keep looking at Mr. Anderson.  I
7  need you to talk to me.

8  THE DEFENDANT:  Yes, sir.  I'm sorry.

9  Mr -- Your Honor, the popsicle, Rigoberto Fernandez,
10  in the place, North Tryon, the popsicles no have the little
11  lady.  No have the logo.  This logo in the popsicles, and the
12  paper popsicles.  Why?  Why can't use it?  I need proof Mr --

13  THE COURT:  Well, this time last year you -- whether
14  you think of it as proof or not -- you got an injunction from
15  me.  This Court told you you couldn't do that anymore.

16  MR. MAESTRE:  No, Your Honor.  I have one year when
17  you say no use the logo.  I no use the logo.  I know use the
18  name.  And the business say only ice cream and Mexican grill,
19  that's it.  I have one year no use the name and no using the
20  little lady.

21  Mr. Rigoberto Fernandez, one day after the food
22  court here opened, one Michoacana, and two minutes to my store
23  in Concord, two minutes.  I don't know why he opened one
24  Michoacana two minutes to my store.

25  So surprise the people come into my business and

1  don't care -- the people don't care, the ice cream, the people

2  like it, my tacos, my quesadilla, because my business is

3  restaurant.  My business is restaurant.  If I sell -- I sell

4  restaurant food, eat and sell to popsicles and ice cream to

5  the company Hershey's.  Hershey's, this institution for me,

6  the ice cream.  You understand me?

7          So I don't know Rigoberto Fernandez open for two

8  minutes.  Right now Rigoberto Fernandez closed her business.

9  But I don't know.  I don't know why it close.  Because I no

10 use the name.  I no use the little lady.  But right now he

11 close her business, for I don't know for why.

12          But why Mr. Rigoberto Fernandez open one business in

13 two minutes to my restaurant?  This is -- I don't know.  It's

14 the way he come.  I don't care.  But the only different owner,

15 the people -- the people no confuse.  My customers no confuse

16 because I restaurant and Mr. Rigoberto Fernandez is ice cream

17 shop.  I'm restaurant.  I sell food, Mexican food.  So this is

18 the different because the people no confuse.  The people

19 understand I sell the food.  Mr -- Mr. Rigoberto sell

20 popsicles and ice cream.  Because Rigoberto Fernandez no sell

21 food, no sell taco, no sell enchilada, no sell pupusas.  I can

22 do it.  I have authorization to sell food in this building,

23 Your Honor.

24          So owner --

25          MR. BOWSER:  So he's asking you, plead to you or

1  beg, before you decide -- so he just ask for you to please

2  verify and, you know, do the diligence to find out about the

3  logo that is -- that Mr. Modesto -- well, what's his name?

4          MR. MAESTRE:  Rigoberto.

5          MR. BOWSER:  I'm sorry.  Is not the current owner of

6  the logo trademark nationwide.  Might be registered as a

7  business owner in the State of North Carolina.  Might have

8  some type of just state trademark for the doll.  But in this

9  case he also was saying that he felt that he was targeted, you

10  know, for no reason as in everybody uses the logo to sell the

11  popsicles really, and he's just --

12          (Mr. Maestre speaking to the interpreter.)

13          MR. BOWSER:  He considers that he did the right

14  thing by opening his business.

15          MR. MAESTRE:  In Concord.

16          MR. BOWSER:  And looking for the right people to ask

17  for guidance about the name and the logo.  The name that he

18  decided to use is not the same as well, you got to see, it is

19  La Linda La Michoacana.

20          He's explaining to me about how he has never been in

21  a situation like this.  So he didn't -- doing his compliance

22  with the Court, in some cases when he -- the first time that

23  he went to a discovery without even knowing they existed by

24  Mr. Anderson was told to him he wasn't even there at the first

25  court.

1          THE COURT:  So one of the pieces of confusion for me

2   is exactly -- there seems to have been something sent by you

3   directly to Mr. Anderson sometime after March of this year and

4   I would like to know what you sent him.

5          MR. BOWSER:  What date was that?

6          THE COURT:  It was represented to me April of this

7   year.

8          MR. BOWSER:  Yes, Your Honor.  He been working with

9   Ms. Andrea Serrano (ph.sp.)  She been working with him,

10  helping him do the paperwork, filling out paperwork, getting

11  more information, sending information to Mr. Anderson.  At

12  this moment she's not in the state.  She's out of the state,

13  business trip, but that's who he been getting help from

14  sending the court information.

15         THE COURT:  What did he send?

16         MR. BOWSER:  So basically it was a motion sent about

17  basically how much money he makes.  And all that information

18  was sent by the lawyer.  And some of those paper -- some of

19  that paperwork that was sent by FedEx did not get in time

20  because of the office, it was changed, or it was not opened.

21  There was a lot of attempts by Fedex to deliver the

22  information or the motion, and Mr. Anderson's office was

23  closed but eventually they did get that information.

24         THE COURT:  What information?

25         MR. BOWSER:  The questions that Mr. Anderson wanted

1   to know about how much he made.

2          THE COURT:  Mr. Maestre, did you keep copies of the

3   information you sent to Mr. Anderson?

4          MR. BOWSER:  He does not have a copy at the moment.

5   He believes all the information copy his current lawyer that

6   is not here has that information.  And he does believe that we

7   have -- they have sent all the information or motions they

8   been requested by Mr. Anderson at this time.  Sometimes but

9   like due to the move they didn't get some of the information

10  on time.  Other than that, all the information been sent on

11  time.

12         Mrs. Serrano, this is what she done for me.  Just

13  have a binder with all the motions and paperwork is last thing

14  she did for me.

15         THE COURT:  Thank you.

16         Mr. Maestre, and Ms. Teran, and Mr. Anderson, I will

17  take all this under advisement.

18         When I rule on the motions for summary judgment,

19  that's the ruling of the Court.  And if, of course, either

20  side can appeal anything I do.  But when I rule, that's the

21  ruling and there may be aspects of the ruling that direct

22  parties to do or not do certain things.  And people get in

23  trouble when they -- they are directed to do or not do

24  something, and they ignore it, or they do opposite.  I would

25  ask each of the parties to talk with their lawyers about the

1   significance.

2          There is a preliminary injunction in place governing

3   certain relationships and certain conduct in this case.  And

4   conduct inconsistent with that injunction is -- could be

5   contempt of court.  And I would ask the attorneys for the

6   parties to discuss the significance of that.

7          Mr. Tran, you're not an attorney now -- you're not a

8   representative of the defendants now but I would ask you to

9   have that conversation with them.

10          You are both here, and I don't know if there is any

11   good -- if there is any reason either side thinks would be

12   helpful, there are conference rooms on either side of the

13   courtroom.

14          I'm taking this under advisement.

15          Mr. Anderson, I am directing you to file a pleading

16   with the Court by the end of the week indicating when you

17   received the documents from the defendant and providing a copy

18   of those documents as a pleading in this case.

19          MR. ANDERSON:  Yes, Your Honor.

20          THE COURT:  And the remaining issues I will take

21   under advisement.

22          Anything further from either side?

23          MR. ANDERSON:  I would request that the motion for

24   preliminary injunction as to the remaining domain names be

25   granted.  I hate to see him make a change in ownership

1  between -- it's already been three months since we moved for
2  it, but I just hate to see --
3          THE COURT:  So is that part of your -- so that's
4  before me on the second --
5          MR. ANDERSON:  The second motion.
6          THE COURT:  Yeah.  So I've got that under
7  advisement.
8          MR. ANDERSON:  We're just requesting that he be
9  ordered not to transfer, divest himself or otherwise --
10         THE COURT:  Yes.  You've asked for that and that's
11 under advisement.
12         MR. ALLAN:  Your Honor --
13         THE COURT:  I'm sorry.  Mr. Allan.
14         MR. ALLAN:  I'm sorry.  Point of clarification.  You
15 asked Mr. Anderson to provide the information to the Court by
16 the end of the week.
17         THE COURT:  Yes.
18         MR. ALLAN:  This being Friday, he has to travel back
19 to California.  Could we have a couple extra days?
20         THE COURT:  Yeah, I was mixed up.  This is Friday.
21 It doesn't feel like Friday.
22         MR. ANDERSON:  I assume seven days from today?
23         THE COURT:  No.  No.  No.  I want this -- I want
24 this -- it shouldn't take you very long to --
25         MR. ANDERSON:  No.  I can probably get my staff --

1      THE COURT:  Don't -- it shouldn't take you very long

2  to put a declaration together saying I got this on a certain

3  date and here it is.  And so maybe the end of the day Monday

4  would be appropriate.  All right.

5      MR. ANDERSON:  Your Honor, I would ask for Tuesday.

6  I have a deadline on the second that I'm kind of chasing right

7  now.

8      THE COURT:  Yes.  I have already ruled on that.

9      (The matter is concluded at 12:40.)

10                     * * * * * *

11  UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF NORTH CAROLINA
12  CERTIFICATE OF OFFICIAL REPORTER

13      I, Laura Andersen, Federal Official Court Reporter,

14  in and for the United States District Court for the Western

15  District of North Carolina, do hereby certify that pursuant to

16  Section 753, Title 28, United States Code that the foregoing

17  is a true and correct transcript of the stenographically

18  reported proceedings held in the above-entitled matter and

19  that the transcript page format is in conformance with the

20  regulations of the Judicial Conference of the United States.

21
        Dated this the 13th day of November 2019.
22

23
                    S/Laura Andersen
24                  Laura Andersen, RMR
                    Federal Official Court Reporter
25