UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

LA MICHOACANA NATURAL, LLC,  )  DOCKET NO. 3:17-cv-727
                            )
        Plaintiff,       )
                            )
        vs.              )
                            )
LUIS MAESTRE, et al,     )
                            )
        Defendants.      )
_____)

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
MARCH 3, 2020

APPEARANCES:

On Behalf of the Plaintiff:

    STEPHEN LEE ANDERSON, ESQ.,
    Anderson & Associates
    31285 Temecula Parkway, Suite 240
    Temecula, California 92592

    ALBERT P. ALLAN, ESQ.,
    Allan Law Firm, PLLC
    409 East Boulevard, Suite 201
    Charlotte, North Carolina 28203

On Behalf of the Defendant Maestre:

    LAURA L. CHAPMAN, ESQ.,
    Sheppard Mullin Richter & Hampton, LLP
    Four Embarcadero Center, 17th Floor
    San Francisco, California 94111

    MATTHEW S. DeANTONIO, ESQ.,
    Bradley Arant Boult Cummings
    214 N. Tryon Street, Suite 3700
    Charlotte, North Carolina 28202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

I N D E X

DEFENDANT WITNESS:                                    PAGE

LUIS MAESTRE
   Direct Examination By Ms. Chapman              52
   Cross-Examination By Mr. Anderson              58

                    * * * * * *

                E X H I B I T S

Plaintiff'S EXHIBIT:
NUMBER                                            ADMITTED
1 .........................................6

                    * * * * * *

ALSO PRESENT:
MICHEAL CORTEZ
Certified Interpreter

1              P R O C E E D I N G S

2    WEDNESDAY, MARCH 4, 2020:

3              (Court called to order at 10:00.)

4              THE COURT:  Good morning, everyone.

5              ALL COUNSEL:  Good morning, Your Honor.

6              THE COURT:  We're here in the matter of La

7    Michoacana v Luis Maestre, et al, on Defendant's Omnibus

8    Motion for Relief from Summary Judgment, Request to Strike

9    Answer and Counterclaim, Request to Dissolve the Preliminary

10   Injunction, to Revoke Plaintiff Counsel's Pro Hac Vice

11   Admission, and for Sanctions.

12             Are the parties ready to proceed?

13             MS. CHAPMAN:  Yes, Your Honor.

14             THE COURT:  Would the attorneys introduce

15   themselves, tell me who you are representing.

16             MR. DeANTONIO:  Thank you, Your Honor.

17             My name is Matt DeAntonio with the Bradley firm here

18   in Charlotte.  With me today is my co-counsel Laura Chapman

19   from Sheppard Mullin, and we represent the Defendants.

20             This is our motion.  And also with us today is our

21   client Mr. Luis Maestre and his wife Ms. Adriana Teran

22   Maestre.

23             Because Mr. Maestre, his primary language is

24   Spanish, we've asked for an interpreter to be here today so

25   that he can understand today's proceedings.  Mr. Micheal

1  Cortez is here, and he's already been sworn in by the clerk.

2  THE COURT:  Thank you.

3  MS. CHAPMAN:  Thank you.

4  MR. ALLAN:  Albert Allan on behalf of La Michoacana,

5  and Mr. Anderson is also here on behalf of La Michoacana, and

6  the client is also here, Your Honor.

7  THE COURT:  Thank you.

8  Mr. DeAntonio, Ms. Chapman, it is your motion.  I

9  will be glad to hear from you.

10  MS. CHAPMAN:  Yes.  Thank you very much, Your Honor.

11  We appreciate that you set this for a hearing.

12  As you know, this is a motion primarily to vacate

13  the Summary Judgment Order.  And the transcript on the hearing

14  at the summary judgment motion indicates that the Court had

15  asked questions about whether the Defendants had responded to

16  discovery.

17  The unequivocal answer to that question is, yes.

18  The Defendants responded to discovery.

19  And we have prepared, if Your Honor would like to

20  see it, a demonstrative cited to the record that shows all of

21  the discovery requests and all of the discovery responses.

22  THE COURT:  I was particularly interested in the

23  hearing and, as my subsequent order reflects, the question of

24  the request to admit.  Because I had in my mind from the

25  pleadings and that hearing that there had been no answer to

1  the request to admit.  I took them as admitted --

2              MS. CHAPMAN:  Yes.

3              THE COURT:  -- for failure to respond.

4              And so that is the particular area of interest that

5  the Court has.

6              MS. CHAPMAN:  Yes, Your Honor.  So therefore you

7  will not need the demonstrative and --

8              THE COURT:  I don't know.

9              MS. CHAPMAN:  Oh, well, that is certainly included.

10  If we may approach and show you.

11              THE COURT:  You may.

12              MR. ANDERSON:  I have not been -- we have not been

13  provided a copy.

14              MR. DeANTONIO:  I have a copy for you.

15              THE COURT:  So, Mr. Anderson, this occurred the

16  first time.  When you address the Court, it is the custom in

17  this district for you to stand and indicate to me what you are

18  requesting.

19              And so you were talking there, and I don't think I

20  heard you.  What --

21              MR. ANDERSON:  I just indicated we had not gotten a

22  copy of what she was proffering to the Court.

23              THE COURT:  Very well.

24              You have now?

25              MR. ANDERSON:  They just handed it to me.  I haven't

1    had a chance to look at it.

2           THE COURT:  So this demonstrative let's, for the

3    record, refer to that as Plaintiff's Exhibit 1.

4           (Plaintiff's Exhibit No. 1 was received into

5    evidence.)

6           MS. CHAPMAN:  Yes, Your Honor.

7           As Plaintiff's Exhibit 1 indicates, the Defendants

8    responded to the discovery that was propounded by the

9    Plaintiff.  This is fairly self-explanatory.  Each document at

10   issue is in the left-hand column.  The dates that the

11   documents were served are in the middle, and the dates that

12   the Defendants provided response are in the right-hand column.

13          Every highlighted statement in yellow reflects the

14   fact that at the time that document was either served or

15   responded to the Defendants were representing themselves.

16          Despite that fact, they did respond to everything.

17          And Your Honor specifically was interested in the

18   response to the Plaintiff's First Set of Request for

19   Admissions to Luis Maestre.  Those are middle way down the

20   page.  In gray background it says "Plaintiff's First RFAs to

21   Luis Maestre."  They were served on June 15, 2018.  That's

22   indicated in the court's docket 116-9.

23          And the responses to those were served several days

24   late, but they were served on July 23, 2018.

25          THE COURT:  My recollection is that the due date was

1    July 18th.

2              MS. CHAPMAN:  I believe that is correct, Your Honor.

3    And, like I said, they were several days late and that is why

4    in our motion we cited cases that allow the Court in its

5    discretion to relieve a party of a late -- file a late-served

6    request for admission.

7              That argument that we made was not responded to by

8    the Plaintiff.  The Plaintiff did not refute any of our cases.

9    And our position as we stated in our reply brief is that as a

10   result that argument has been waived, and we would

11   respectfully request that the Court allow those late-served

12   responses to the request for admissions.

13             Particularly because those responses provide a

14   defense, a meritorious defense to the case for claim of

15   trademark infringement.

16             This case has one -- essentially one material fact

17   that's at issue, which is who had priority of use of the marks

18   in the Charlotte, North Carolina, metropolitan market area?

19             And the answer to that is the Defendants did.  And

20   that fact is not disputed.

21             The Plaintiff provided an opposition to our motion.

22   Plaintiff asked for some additional time.  You granted the

23   time, and the Court approved that.

24             And nowhere in the Plaintiff's opposition to the

25   motion here today does the Plaintiff contest that the priority

1    is with the Defendants.

2          And we submitted many declarations, several

3    declarations that attest to the fact that the Defendants have

4    priority.

5          In a Rule 60 motion we have to be timely, which is

6    within a year.  We have to show a meritorious defense, which

7    according to the case law does not require that much.  And we

8    have met it because we have priority.  And we have to show

9    that there would be no unfair prejudice.

10         When we look at the summary judgment order that the

11    Court issued, which is document 78, which was filed on June 6,

12    2019, Footnote 1 is really indicative of what we're here today

13    on is to show that there really is a pattern and practice that

14    relates to Footnote 1.

15         In Footnote 1, as the Court references what had

16    happened at the summary judgment hearing in terms of some

17    documents that were provided, and the Court explained that the

18    Court was startled and baffled to find out that the documents

19    that were provided by the Defendant to the Plaintiff contained

20    relevant responsive information that the Plaintiff's counsel

21    had said at the hearing on the summary judgment motion were

22    not responsive.

23         This situation is really the same thing with respect

24    to the request for admissions.

25         The request for admissions were served.  Mr --

1   Plaintiff's counsel Mr. Anderson had filed a sworn declaration
2   with the Court, which is document 31-1 at paragraph 10.  And
3   in that declaration, which all of this is in our papers, he
4   acknowledged receipt of the responses to the request for
5   admissions.  And he acknowledged that he had received them on
6   July 23, 2018, again, that's in docket 31 and 31-1 at
7   paragraph 10.  He did that at the time that he was asking to
8   compel other discovery responses.
9          And as time passed, then the narrative around these
10  discovery responses changed, and then he began to say he did
11  not receive them.
12         He did receive them.  He swore under oath he
13  received them.
14         Somewhat concerning is that after -- after the Court
15  publishes the summary judgment order where the Court explains
16  that the Court is startled and baffled, one would expect, I
17  believe, under the governing applicable rules that Plaintiff's
18  counsel would inform the Court, I have found -- after looking
19  through my records I do see the responses to request for
20  admissions.  But that did not happen.
21         And what we see in the opposition to this motion I
22  believe is a clear intention by the Plaintiff and its counsel
23  to have made that --
24         THE COURT:  I don't think you were here at the
25  hearing which triggered the footnote you're talking about.

1          At that hearing counsel for the Plaintiff said
2   different things.  One part of the hearing he said, "Frankly,
3   I did not even open it or look at it because we already had
4   motions for summary judgment pending."
5          At a subsequent part of the hearing he indicates, "I
6   misspoke.  I didn't say I didn't read it.  It's just that it
7   didn't make sense.  They weren't responsive."
8          And then subsequent to the hearing I directed
9   counsel to file the package that he did receive.
10         And so that's all before me, the very inconsistent
11  statements of counsel at the hearing and then my own perusal
12  of the package that was filed.
13         So what more did you expect him to say?
14         MS. CHAPMAN:  I think that what we have here at
15  issue is a set of request for admissions that in response
16  to --
17         THE COURT:  You're talking about which, the first or
18  the second?
19         MS. CHAPMAN:  Yes, Your Honor.  I hear what you are
20  saying about the Footnote 1 in the Court's order.  And if I
21  may, if it's acceptable, I think I would just like to go back
22  to really exactly what we have at issue here, which is the
23  request for admissions, and the fact that they were served on
24  July 23, 2018, almost a year before the summary judgment
25  motion was considered in this case, and the fact that there

1  was a sworn acknowledgment in document 31-1 by the Plaintiff's
2  counsel that he had received them.

3          And the fact that my comment which may not be
4  helpful to the Court is that, I think, once you receive the
5  summary judgment order at that point you know for certain that
6  the Court is basing its entire summary judgment decision on
7  the mistaken understanding that no responses to the RFAs had
8  been served.

9          Once you see that, at a very bear bones minimum, I
10 believe you would have an obligation to contact the Court and
11 to correct the record and to inform the Court that the
12 entirety of the basis of the summary judgment is factually
13 incorrect.

14         And when we look at the response to request for
15 admission 36, we see that summary judgment could not or should
16 not have been granted.  Because in the response to request for
17 admission 36, the defense explains he had been using the mark
18 "La Michoacana" and "La Linda Michoacana" since 2008.  And
19 that is priority of use and that is a meritorious defense.

20         THE COURT:  So walk me through that.  Where is that
21 found?

22         MS. CHAPMAN:  The response to -- this is in our
23 chart, Your Honor, it is docket 115-10, page 4 of 5 on docket
24 115-10.

25         THE COURT:  Go ahead and tell me what it says.

1    MS. CHAPMAN:  At the very bottom it says:

2    "Denied.  I have been using the name La Michoacana

3 since 2008."

4    That prohibits summary judgment and Plaintiff knew

5 that.

6    The request is on document 116-9, page 8 of 14.  The

7 request number 36 states:

8    "Admit that you used the trademark 'La Michoacana'

9 in connection with ice cream in order to confuse the

10 purchasing public regarding any affiliation, sponsorship, or

11 other association to Plaintiff."

12    The response to that again is:  "Denied.  I have

13 been using the name La Michoacana since 2008."

14    THE COURT:  All right.

15    MS. CHAPMAN:  That prohibits summary judgment and

16 that the Plaintiff had the burden on summary judgment and

17 attempted and successfully attempted to meet that burden by

18 making the false statement that the responses to the first

19 request -- first set of admissions had not been served.

20    So to some extent this is a fairly straightforward

21 situation, and at a minimum it is a mistake that qualifies

22 under Rule 60(b) to vacate the summary judgment order.

23    It is our contention that the evidence that exists

24 in the case mandates summary judgment be granted in favor of

25 the Defendants because there is no disputed fact on the issue

1  of priority use.  There is nothing in the opposition that
2  disputes the evidence that we have provided.
3          So we ask for vacating the current summary judgment
4  order and entry of summary judgment in favor of the
5  Defendants.
6          THE COURT:  All right.  Do you wish to speak to the
7  other requests for relief?
8          MS. CHAPMAN:  Yes.
9          It appears to us that this a situation in which a
10 material, knowing, false statement was made to the Court on
11 repeated occasions.
12         And as I said, at a minimum, by the time the summary
13 judgment order got granted, at a minimum, there should have
14 been an effort to explain that was incorrect.
15         But even before then there were numerous false
16 statements about the lack of the RFAs having been served.  It
17 was repeated.  And what we can see in the opposition to this
18 motion, the opposition doesn't say "I made a mistake.  It was
19 an oversight.  I did not realize at the time of the hearing
20 that I had those responses."
21         That is not the Defendant's -- the Plaintiff's
22 position.
23         The Plaintiff's position is that it was justified in
24 telling the Court a misstatement.  And it does not seem that
25 that could possibly be true.  It cannot possibly be that any

1  of the excuses amount to permission to have made a

2  misstatement to the Court on a repeated basis.

3         Because of that, and because of the acts of

4  intimidation and -- frankly, this is -- this appears to be

5  somewhat extreme.  I have not, you know, the act of

6  intimidating a witness, going to her place of business,

7  threatening to burn down the restaurant with her inside of it,

8  making the obscene gesture, threatening the Defendants with

9  arrest, demanding that they show their identification when

10  they are in the courthouse, and photographing it, plus those

11  repeated misrepresentations, plus the refusal to acknowledge

12  that what had happened and what had been done was incorrect

13  and wrong, seems to justify revoking the Pro Hac Vice

14  admission, and we do request that.

15         THE COURT:  You have filed an affidavit setting

16  forth a very disturbing set of -- or disturbing conduct on the

17  behalf of Plaintiff's counsel the day before the preliminary

18  injunction hearing which if true would give this Court great

19  pause, great concern.  And Mr. Anderson has filed response

20  indicating a different version of events.

21         And so how does this Court determine the truth of

22  that matter?

23         MS. CHAPMAN:  I believe that there are two -- there

24  are two things that the Court can do to assess credibility.

25         I think one thing the Court can do is look at the

1    photograph that is included in one of the declarations to see

2    that that behavior is more consistent with a threat.  It is

3    not consistent with what Mr. Anderson is saying.

4            And the police report, I mean, these folks filed a

5    police report.

6            THE COURT:  Who filed a police report?

7            MS. CHAPMAN:  The -- I believe it was Talmeda

8    Mendoza, the woman who owns the restaurant.  I think she was

9    the one who contacted the police, not the employee who was

10   actually threatened.  I may be incorrect on that point.

11           But the employee who was threatened, Your Honor, she

12   quit her job.  That's a -- that reflects -- and she said that

13   under oath.  That reflects fear, and you're going to be afraid

14   when someone threatens to burn the place down with you inside.

15           So I'm not really here to prove the case, I think,

16   as to you know whether, you know, this is a professional

17   member of the bar.  I'm a member of the bar.  But I do feel

18   that the behavior is -- even the misrepresentations, the

19   repeated misrepresentations --

20           THE COURT:  Well, from your comments you're relying

21   upon the affidavit.  I guess I should construe from that that

22   I would not have the opportunity to hear that evidence

23   firsthand.

24           MS. CHAPMAN:  If the Court saw fit to have those

25   witnesses come in and testify to it, that could be done,

1    presumably.

2            THE COURT:  But you're not prepared to do that

3    today?

4            MS. CHAPMAN:  I am not prepared to do that today,

5    Your Honor.

6            THE COURT:  All right.

7            Anything else on?

8            MS. CHAPMAN:  We would also request the sanctions in

9    the form of what it costs to bring this motion that we could

10   provide information about to the Court.

11           And when the -- if the Court sees fit to vacate the

12   summary judgment order, the domain names that were included in

13   the summary judgment order should be reversed back to the

14   Defendant.  That's in the summary judgment order, I just

15   wanted to be clear.

16           THE COURT:  How would the Court do that?

17           MS. CHAPMAN:  Just put it in the order that -- you

18   are requiring the Plaintiff to transfer them back.  And then

19   the Plaintiff will have to take the steps to transfer them

20   back.

21           Mr. Maestre transferred the domain names in

22   accordance with the Court's summary judgment order.

23           THE COURT:  Right.

24           MS. CHAPMAN:  Yes, Your Honor.

25           THE COURT:  Thank you.

1          MS. CHAPMAN:  Thank you, Your Honor.

2          THE COURT:  Mr. Anderson, glad to hear from you.

3          MR. ANDERSON:  Good morning, Your Honor.

4          Well, that was a grab bag of information I would

5    like to address.  I'll start with the sanctions and costs.

6          THE COURT:  Well, no, don't start there.  Start with

7    the substance.  Let's start about --

8          MR. ANDERSON:  Well, that was the last thing she

9    said, I was just --

10         THE COURT:  You should be interested in what the

11   Court's interested in.  And the Court is interested in the

12   substantive.

13         MR. ANDERSON:  Oh, first and foremost I have to say

14   that I am embarrassed.  I embarrassed myself.  I embarrassed

15   my co-counsel.  I embarrassed my client by flipping the finger

16   at an employee.  But the back story to that is quite important

17   in that -- I'm sorry.

18         Yes, and again, we can get to that.  But the most

19   important thing we need to address, as co-counsel just pointed

20   out, is the request for admissions question.

21         And again, by no means did I misstate the fact that

22   they served, apparently, via fax, an unsigned document from a

23   third party who was not verified, it didn't comply with any of

24   the federal rules of civil procedure.  It wasn't signed.  It

25   wasn't identified.  The questions weren't there, and they were

1    not complete.

2            But nonetheless, after that there were numerous

3    motions addressed by the magistrate judge who gave them

4    extension after extension.

5            THE COURT:  Well, on other things, not the request

6    for admission.

7            MR. ANDERSON:  Including the request for admissions,

8    sir, which were stipulated by the parties that they would have

9    an opportunity to be relieved from their waiver that was

10   caused by their untimely and ineffective --

11           THE COURT:  I think in July of 18 you moved to

12   compel disclosures and responses to Plaintiff's First Request

13   For Production and Interrogatories.  That did not deal with

14   the request for admit which Defendants claim had been sent to

15   you four days before the motion to compel.

16           MR. ANDERSON:  Yes.  Well, the -- there was no need

17   to compel because they did not file responses within the 30

18   days required and therefore they're deemed admitted.  At that

19   point Defendants need to move to be relieved from that

20   admission.

21           That is not our burden to do so but their burden to

22   do so.

23           Because again an unsigned, faxed copy where we never

24   agreed to accept facsimile, unverified set that came in

25   approximately five days late via fax without any notifications

1   don't qualify as valid responses.

2          And as I indicated, the federal rules specifically

3   say if they aren't compliant then they can't be relied on and

4   they don't count.

5          But after that, again, the magistrate judge gave --

6   we stipulated that he could be relieved from that default if

7   he just provided the answers by February 22, 2019.  He was

8   required by stipulation number 50 to serve them on both

9   parties, that is, Mr. Allan and myself.  It's in document 50,

10  the stipulation, that in detail goes through and explains all

11  the dates and deadlines and sets forth that they're

12  incomplete.

13         THE COURT:  Yes, that stipulation seems to be

14  dubious to me.  It seems like there was new counsel in the

15  case that had not been representing the Defendants when they

16  purportedly filed a response.

17         And there doesn't seem to be any indication in the

18  record that that new counsel actually even was aware that a

19  response had been filed, whether it was a timely response,

20  whether it was a sufficient response.  It's different from no

21  response.  And it appears to me that that counsel was not even

22  aware of that event when he entered into the stipulation.

23  So --

24         MR. ANDERSON:  Well, sir.

25         THE COURT:  -- I think the argument that the

1    Defendant is making is that the Court was defrauded.

2              But in that course of conduct the counsel that came

3    in and represented the Defendant may have also been misled.

4              MR. ANDERSON:  No, sir.  We had numerous meet and

5    confer letters with counsel, repeated conversations with

6    counsel, and they were aware.  They had even requested that I

7    agreed to set aside the admissions that occur as a matter of

8    law for failure to provide them, and we did so.

9              THE COURT:  See, you're not the judge here.  You're

10   an attorney.  You're an advocate for a party.  You seem to be

11   usurping the role of the judge saying what is deemed admitted,

12   and what has the force of law.  All of that is before this

13   Court now.  And it does seem to me that, frankly, I was misled

14   by representations by you -- not that there were untimely

15   filed responses or inadequate responses, but there were no

16   responses to the request to admit.

17             Apparently what your position is, is you have ruled

18   on that issue and determined that they were inadequate and

19   therefore there was no response.

20             But it seems to me incumbent upon you to have

21   demonstrated to me that there were responses filed that may

22   have been adequate or not adequate, but the fact of filing

23   should have been made known to me.

24             MR. ANDERSON:  Sir, on the day of the hearing in

25   light of the many -- I mean, this case had been going at that

1  point for several years.  But again, I would like to go

2  through a few items here to demonstrate the fact there.

3          But the bottom line there, and as I put in my reply

4  brief that again, without -- they're untimely.  And the rule

5  says if they aren't provided then they're deemed admitted.

6          THE COURT:  And the case law also says that the

7  Court has great discretion in dealing with pro se --

8          MR. ANDERSON:  Yes.

9          THE COURT:  No, no, wait.  You're doing it again.

10         MR. ANDERSON:  Sorry.

11         THE COURT:  That the Court has discretion in dealing

12  with pro se litigants in waiving an untimely filed pleading.

13  But I have to know about it to make that exercise of

14  discretion.

15         MR. ANDERSON:  Mr -- his counsel was aware of it,

16  and he did not provide that.  We -- again, if I had a few

17  minutes to go through the file, I could probably find a few

18  letters where counsel specifically requested that.

19         But I know he requested to be relieved from the

20  failure -- the deemed admission that is set forth in the

21  federal rules.

22         THE COURT:  That is subject to the Court's

23  discretion.

24         MR. ANDERSON:  And he could make a motion to seek to

25  have it set aside.  That's what he needs to do, and we advised

1    him of that.  But yet he never filed such a motion.  He never

2    provided the initial disclosures.  He didn't provide the other

3    discovery requests that -- responses that we had repeatedly

4    made.  And again, they were never served properly.  They

5    weren't served under the federal rules.

6              You can't fax somebody an unsigned document and call

7    that a discovery response.

8              Counsel had an opportunity to work with it.  He had

9    been involved, came in in September of 2018.  He was involved

10   in the case for many, many months until the following June.

11             But I want to go through a few facts here to

12   demonstrate the state of mind that I had at the time.

13             First of all, as you know, we filed the complaint in

14   this action in December of '17.

15             In February of 2018, in document 7, Defendants filed

16   a motion to dismiss stating they are not the owners of the

17   operating of the restaurant.  He's -- movant Luis Maestre is

18   acting as the sole proprietor, as a custodian for the sole

19   proprietor established by his brother who lived in Columbia

20   since 2016.

21             So they came out denied.  Adriana also said she

22   isn't involved in any way in the store.

23             We filed document A --

24             THE COURT:  How is any of that relevant to the

25   motion before the Court right now?

1           MR. ANDERSON:  I was going to --

2           THE COURT:  The motion before the Court right now is

3     that summary judgment should be set aside because of

4     misrepresentations to the Court by you.  It has nothing to do

5     with, doesn't seem to me, with Mr. Maestre or his wife with

6     respect to claims of ownership.

7           MR. ANDERSON:  As far as the request for admissions

8     go, again, the stipulation that we signed, the time that we

9     spent with counsel to work through the fact that they had not

10    provided adequate responses to any of the discovery up to that

11    point.

12          And as far as I was aware, and I still maintain,

13    that those fax copies of July 23rd are not valid documents as

14    a matter of law.  They are unsigned.  They aren't identified.

15    They aren't labeled.  There was no proof of service.  They

16    were never mailed.  They were simply faxed and they aren't

17    signed.  They're completely ineffective under Rule 26 which

18    requires a signature.

19          Now, even if they had just been signed or verified,

20    but they never did that.  They were deemed admitted.  We went

21    ahead and we made motions.

22          THE COURT:  So when something is deemed admitted --

23          MR. ANDERSON:  Yes --

24          THE COURT:  -- who does that deeming?

25          MR. ANDERSON:  The law.  Rule 36 states that a

failure to deny within the time it is deemed admitted. And

after those 30 days go by it is not the propounding party's

job to go ask the Court to deem them admitted. They are

deemed admitted as a matter of law because they were never

served. They were never signed, and they were untimely from

the outset. They were already deemed admitted.

So the document themselves, this -- this fax does

not serve as a response to request for admissions.

On top of that there were objections. There are

objections in there. We dealt with counsel about those

objections. They promised to provide us with further

responses but they never did.

And if you look at document 63, Your Honor, this is

important, after -- at or around the time when the third

attorney sought to withdraw, when Mr. Tran sought to withdraw,

Adriana Teran and Luis Maestre signed a sworn document that

says: "We understand, we need to send more information and

documents to Anderson because of the Judge, but we do not have

the information yet."

So again, it is clear that all the way up through

March of 2019 they were admitting that they had not provided

the documents. They had not provided the answers, and they

had not done so without objections. They waived because they

did not timely respond to the RFAs or to any of the other

discovery.

1    Ultimately, after the magistrate judge was involved,
2  he encouraged my co-counsel and I to stipulate, to give them
3  another chance.  We thought about the fact that he was a pro
4  per at some points.  We gave them the opportunity.
5    The stipulation, sir, is a signed document.  It
6  resulted in a court order itself, namely, the Court's
7  Scheduling Order.
8    There were numerous motions for sanctions in between
9  filed by us that were kicked back by the Court, that is, the
10 magistrate judge.  The magistrate judge signed on February 21,
11 2019, that the Court was not willing to allow Mr. Tran
12 withdraw until the stipulated discovery agreement had been
13 satisfied.
14    And with respect to that, we also were requesting
15 complete addresses and contact information for the Defendants.
16    As this Court is well aware, mail came back from
17 this Court, mail came back from Plaintiff addressed to the pro
18 per Defendant.  So he wasn't even responding.
19    And Mr. Peace, the prior counsel had indicated in
20 his declaration that Luis Maestre's address was reflected on
21 his driver's license and that's the reason we sought to see
22 his driver's license.
23    THE COURT:  In a very improper way, I might say.
24    MR. ANDERSON:  Well, he's the -- again, I don't know
25 what's improper.  He -- I asked him, do you have your driver's

1  license?  He showed it to me.  I took a picture of it.

2          THE COURT:  Well, he says, and it doesn't seem to be

3  contradicted, that that was a condition of a hearing going

4  forward.

5          MR. ANDERSON:  This was after the last hearing Mr --

6          THE COURT:  I think as I recall the affidavit it was

7  before the last hearing.

8          MR. ANDERSON:  It was in the hallway after the last

9  hearing.  You were there.  I have a copy of the photo I can

10  show you the exact time on it.

11          THE COURT:  I'm saying, as an officer of the Court

12  if you're accosting a party in the hall and telling them that

13  they have to produce an identification before the hearing goes

14  forward, that's an egregious violation of your --

15          MR. ANDERSON:  I don't disagree, sir.  Although that

16  is not what happened.  It was after the hearing.  The Court

17  had already issued the injunctive order, final order.  We were

18  in the hallway.  We were talking.  Counsel was there.  I was

19  there.  Rigoberto was there.  And I asked him, "Can I take a

20  picture of your driver's license?"  He voluntarily pulled it

21  out.  I took a picture of it.

22          Again, they're painting a story here to try to get

23  your ire because --

24          THE COURT:  They don't have to get my ire.  The

25  story they are painting is very consistent with the impression

1  I formed through your representation at the last hearing that
2  is very consistent with what I observed.  So I don't know that
3  they're drawing my ire.  They're just --

4          MR. ANDERSON:  Well, sir, it's not true and counsel
5  can verify that.  I can show you the Court that.

6          THE COURT:  So you're saying the timing is different
7  than?

8          MR. ANDERSON:  Absolutely.  If you allow me to turn
9  on my phone I will show you that it was approximately 12:00.
10 It was after our last hearing.  It was not before.  I have not
11 had any direct communication, except a couple phone calls with
12 Mr. Maestre, since such time.

13         And again, to simply request a Defendant who is now
14 a judgment debtor to provide identification that shows his
15 driver's license to show where he lives when we've had mail
16 returned is not an unreasonable request.

17         But as far as that last hearing goes, again, I had
18 come in on a red eye flight.  Perhaps I was confused about the
19 question about whether or not he ever provided.  But if you
20 ask me again, "Did he serve you responses to those RFAs?"  The
21 answer is still, "No."

22         A July 23rd facsimile that is not signed, that is
23 not verified under Rule 26, and is not even identified, and
24 they were incomplete.  They had objections that were waived.
25 And we wrote Mr. Maestre.  I personally wrote and dealt with

1    Mr. Maestre several times to try to get additional responses.

2              They agreed to provide additional responses

3    repeatedly but never did.

4              We stipulated with counsel.  He came in.  The

5    magistrate judge spent numerous hearings on that.  I think

6    there were three and four hearings.

7              And, in fact, while he ordered them to provide it by

8    a date certain they still didn't do it.  I requested

9    sanctions.  The magistrate judge denied them on the grounds

10   that he was a pro per.

11             But what I was trying to get at before was ever

12   since the beginning of this case the Defendants have been

13   waffling back and forth.  And if you give me just a few

14   minutes I can show you that, for example, in their motion to

15   dismiss he denied it was his store.

16             In their answer filed with this Court and signed

17   under penalty of perjury they denied that they ran the

18   operation.

19             They have denials to paragraph 17 to 22 which

20   respectively say Luis Maestre and Adriana Maestre have an ice

21   cream store in Charlotte.  They deny all that.

22             Now, we also provided in document 8, and the

23   exhibits in 8, way, way back there, documents that showed that

24   they had a number of websites that said they began their

25   operations in 2015.  Those are what's on their websites.  I

1  provided those years ago.  I provided a couple extra copies
2  yesterday.

3           We were concerned even then because we saw that
4  Mocachica chicken restaurant shared an Instagram account and
5  Facebook account with La Michoacana, which was an
6  unincorporated association, that Luis Maestre denied was his.
7  Said it was the brother's in Columbia.  He denied he had any
8  relationship to Mocachica.  But the Mocachica website itself
9  says "it is brought to you from the same people that own La
10  Michoacana."

11           Moving on.

12           In their answer they denied running the restaurant.

13           In the motion to dismiss that's at 13, document 13,
14  again, they said:  "Movants are not the owners of the
15  restaurant."

16           Now they're trying to say that they were all the way
17  back since 2008, but they never provided any such information.

18           Counsel here wants to say we agree or don't dispute
19  the issue of priority.  That could not be any further from the
20  truth.

21           Simply by providing one declaration after he's been
22  found adjudged liable in this case to say that's good
23  sufficient to grant a summary judgment.

24           Most of all, counsel's arguments all refer to
25  summary judgment standards.  This is a Rule 60 motion.

1   They're seeking extraordinary relief.  This is about a court
2   order that happened last June.

3          In our motion for preliminary injunction also,
4   document 22, there are declarations by myself that refer to
5   what the photographs and the information about the stores.

6          You see, in February of 2018, when they were
7   represented by Mr. Peace and Mr. Osborne, Defendants indicated
8   to us and the Court that they had taken down the signage and
9   that they were in compliance.

10         Later after numerous motions to withdraw, Luis was
11  self-represented.  He agreed to meet with me so we could
12  discuss the upcoming requirement that we meet and confer and
13  set a scheduling order and whatnot.  And he wanted me to come
14  by the store and see that he had taken down the signage.

15         I went in there, I saw it and I provided photographs
16  for this Court that there were a number of Michoacana on the
17  labels, on the signs, on the walls, and even a sign right next
18  to the cash register the first phone number on it says
19  Mocachica.

20         So when I walked in there to meet the Defendant, he
21  ran out the back door.  I called his cell phone.  He didn't
22  answer.  I walked over to Mocachica to see if he was there.
23  He wasn't.  They told me that he had no relation to the
24  business.  I knew that wasn't true.  Now today they're saying
25  it's his aunt's business.  His Aunt Thelma Mendoza.  But our

1  research already showed that Thelma Mendoza, he and Adriana

2  Teran shared a residence prior to that. So we knew there was

3  a connection there.

4       When I walked into that store and was told "Luis

5  isn't here. We don't know who Luis is." He had a meeting

6  with him. He had taken up time. I took time, I went across

7  town. It wasn't nearly as heavy handed as counsel would like

8  it to be. Quite frankly I was a little bit amused. You can

9  see in the picture I'm actually laughing because I said, "You

10  can leave this for Luis." And that was when I flipped the

11  bird at them because they wouldn't put him in contact with me

12  and he was avoiding me.

13       I don't know as a Plaintiff how to work with a court

14  order that requires us to meet and confer when the Defendant

15  pro per won't even talk to you and runs out when you have a

16  meeting with him.

17       But irrespectively, they never provided the

18  responses.

19       Counsel, in fact, has made this whole motion seizing

20  upon a declaration 31-1, where I stated to this Court that we

21  received incomplete unsigned documents. 31-1 which, again

22  I'll look at the docket, that didn't solve the problem. It

23  just got kicked down the road again.

24       Thirty-one I made a motion to compel initial

25  disclosures and responses to the discovery sets.

1          We did, I believe, include discussion in there, and
2    clearly counsel's aware, that I forthright told the Court we
3    got this fax, but it's not sufficient.
4          THE COURT:  On page 13 of the hearing I asked you
5    pointblank:
6          "Mr. Anderson, have you received any responses to
7    your request to admit?
8          "ANSWER:  Not that I'm aware of, Your Honor.  I don't
9        have any in my file."
10         MR. ANDERSON:  Yes.  And as I indicated, those --
11   that fax was insufficient, and I put reference to that fax in
12   my document, in my declaration 31-1.  I was never intending to
13   hide that fact from the Court.
14         After a red eye flight, and 2 years later and a
15   stipulation in which the other side agreed to provide answers
16   but yet didn't, maybe I was mistaken in how I read the
17   question from the Court, meaning, in response to the
18   stipulation or since February or ever.
19         But again I still --
20         THE COURT:  Page 12:  "We never received responses
21   for the requests to admissions."
22         Page 15:  "However, frankly, I did not even open it
23   or look at it because we already had motions for summary
24   judgment pending."
25         MR. ANDERSON:  That was for the second set of

1    requests.

2              THE COURT:  That is for the second set.

3              MR. ANDERSON:  That is for the second set, sir.

4              THE COURT:  That's true.

5              MR. ANDERSON:  The first set, again, I still

6    maintain I never got responses.

7              THE COURT:  Do you understand that legally there's a

8    difference between not responding and an inadequate response?

9    Is that concept familiar to you?

10             MR. ANDERSON:  I do.  But as I indicated, and again,

11   I've been practicing law, it will be 30 years this year.  So

12   with all due respect, sir, I know the Federal Rules of Civil

13   Procedure and Rule 26(g)(1) requires a verification, a

14   signature on the document by an attorney or by a party.

15             It's not signed.  It also -- rule -- I think it's 36

16   requires that you set forth the answer underneath the

17   question.  Well, they didn't do that.

18             But Rule 36 also gives them 30 days or it is deemed

19   admitted.  They didn't do it in time.

20             And then they had objections that were waived.  And

21   I'm telling you, I wrote repeated, meet and confer letters to

22   the Defendant himself and, ultimately, to Mr. Tran.  We

23   addressed this.

24             So again, if you look at document number 31, I made

25   it clear to the magistrate judge that we were seeking to

1  compel those answers.

2          The Court in 33 ordered responses to the ROGs and

3  the RFPs.  Also that they give us discovery -- initial

4  disclosures.  But that too wasn't complied with.

5          As you see in 38, then the Court reset, gave them

6  additional time to answer.  We went back through this again.

7          Ultimately, so on 47 the Court denied the motion for

8  sanctions.

9          I know that the Court didn't like my stipulation

10 with the Defendant himself.  So it was a good thing he got

11 counsel, and we were able to provide the subsequent under 50,

12 which was both the stipulation about the scheduling order, and

13 also to resolve the parties discovery disputes.

14          And, sir, we were as fair as we could be.  We agreed

15 to let him have a fair clean shot.  He got 45 days, I think,

16 to respond to that discovery by February so he could -- if he

17 was supposed to provide the answers by, I believe,

18 February 22nd.  He did not.  He was required to provide them

19 to myself and Mr. Allan.  He did not.

20          And those first set of requests for admissions, as

21 far as I'm concerned, have never been provided.  And under

22 Rule 26(g) without being signed they just don't count.

23          And as I indicated in my response, there's actually

24 a statement in 26 that says, "other parties have no duty to

25 act on an unsigned disclosure, request, response, or objection

1  until it is signed.  And the Court must strike it unless a
2  signature is promptly supplied after the omission is called to
3  the attorney or party's attention."

4          That's FRCP 26(g)(2).

5          I don't know why counsel can suggest that somehow
6  I'm playing fast and loose with the facts or misleading the
7  Court about the first set of requests for admissions.

8          And it wasn't just the first set of request for
9  admissions.  It was the initial disclosures.  It was the first
10  set of interrogatories, first set of document requests.

11          But ultimately, again, this Court, this Judge,
12  approved the stipulation at the time, made a revised order
13  under 52, and we had continued going forward.

14          Then again after February 22, 2019, when the
15  responses didn't come in, we made a motion for sanctions.  But
16  what we were met with was a motion to withdraw.

17          And in that motion to withdraw counsel specifically
18  indicated what his client needed to do, and that included
19  providing those discovery responses which leads to document 63
20  where Luis and Adriana admit that "we need to send more
21  information and documents to Anderson because of the Judge but
22  we don't have the information yet."

23          Now I don't know when the case is filed in 2017 why
24  we have to wait, ultimately, what, years for discovery.  And
25  we've been trying to be good to a pro per when he was pro per.

1  But he went through three or four attorneys along the way,

2  filed a cross complaint.

3          And finally, Your Honor, even the initial

4  disclosures themselves, as I pointed out, those are required

5  to be sent to both myself and Mr. Allan by the 11th of

6  February.  I brought with me Mr. Tran's envelope dated

7  February 12th.  So even the disclosures -- initial disclosures

8  didn't comply with either stipulation or the Court Order.

9          So repeatedly they blew deadlines.  They left us in

10 the lurch.  Again, I don't know as a Plaintiff what we can do

11 when the Defendant is simply ducking out and hiding and not

12 providing discovery responses.

13         But on one specific day, again, I did not miss -- I

14 mean, I may have misspoke, but I certainly, without intention,

15 and again, perhaps some confusion based on the fact that the

16 stipulation required them to provide these amended responses

17 by February 22nd, and as of June of 19 they still had not come

18 in.

19         THE COURT:  What about the allegation Defendants

20 make that appears noticed for deposition on April 10, 2019,

21 and showed up for the deposition, neither attorney was there

22 prepared to take the deposition.

23         MR. ANDERSON:  Mr. Tran had apparently indicated --

24 I had sent that to Mr. Tran while he was represented.  We

25 never got confirmation, and I was not aware that the Defendant

1  was even aware of that.  Because we had sent the deposition

2  notice --

3          THE COURT:  So you're not contesting that he showed

4  up for his deposition and attorneys were not prepared to go

5  forward --

6          MR. ANDERSON:  He did show up --

7          THE COURT:  -- based upon notice.

8          MR. ANDERSON:  -- in Mr. Allan's office, in, I

9  believe that was April of '19.  No, I was not there.  I was

10 not aware.  I had believed that it would be rescheduled

11 because I never got confirmation either from the Defendant or

12 his prior counsel who I had served the notice but not to the

13 Defendant himself.

14          By the way, there was a subpoena for documents

15 attached to that, and he didn't provide any documents that day

16 or bring any with him that I'm aware of.

17          THE COURT:  And what about the allegation with

18 respect to threatening -- the post summary judgment

19 threatening telephone calls in which the Defendant alleges

20 that you threatened him with arrest?

21          MR. ANDERSON:  After we had filed the motion for

22 contempt that was before this Court, has been remaining before

23 this Court now for six months or so, he was self-represented.

24 We had a telephone discussion.  I think I put the context of

25 that in my declaration to that motion in which Mr. Maestre

1    laughed at me.  He told me PLM would be handling it.  I should

2    chase them for the money.  He refused to turn over any of the

3    domain names, said he didn't have possession of them.

4            THE COURT:  But you're not denying that you told him

5    that he would be subject to arrest?

6            MR. ANDERSON:  I told him that we would be seeking

7    an order that he appear in court or ultimately what would be a

8    order for examination of judgment debtor or that we would be

9    seeking contempt against him and that he had a court order

10   ordering him not to sell this infringing ice cream.  He was

11   selling the infringing ice cream.  He admitted selling the

12   infringing ice cream.

13           And I told him that he if he did not pay anything,

14   and he continued to violate the order that we would seek an

15   order for contempt and that would -- might include financial

16   and even potentially that he could go to jail.

17           I never said to him that I would seek his arrest,

18   but I did indicate that we would be asking the Court for

19   sanctions for his contemptuous actions that continued after he

20   was served with a court order prohibiting him from using the

21   marks.

22           THE COURT:  See, I'm particularly concerned with a

23   statement whether or not you told him that he could be

24   arrested.

25           MR. ANDERSON:  I did not use the word "arrested."

1   But I did say that punishment for contempt may include
2   financial and could include jail.  That's true.
3           He's a self-represented party who is not following a
4   very clear court order.  And in as much as he's not paying --
5   again, we would -- and we are seeking recourse for his failure
6   to comply with this Court's order.
7           Which brings me to the question of why PLM --
8           THE COURT:  So when he says in document 116
9   paragraph 47:  "Mr. Anderson was clearly frustrated and said
10  that I was in violation of the Order and that he was going to
11  call the Judge and have me and my wife arrested because we
12  were not following the Judge's Order."
13          MR. ANDERSON:  Well, sir, clearly this man is
14  both -- and I can demonstrate it repeatedly.  He is a blatant
15  liar, and to his credit, he doesn't understand English so
16  well.  So I don't know where he got that.  But I never told
17  him that he or his wife -- I never even mentioned his wife.
18          At best of all I would say "We are seeking to hold
19  you in contempt for failing to comply with federal court
20  order."  That was very explicit that required him to stop
21  using the mark, and he was continuing to use the mark, and I
22  advised him that we were seeking the contempt citation against
23  him.
24          THE COURT:  All right.
25          MR. ANDERSON:  But I was not -- I would never call

1   the Judge.  I mean, that in itself shows it's nonsense.  I

2   don't call the Judge.  You don't take my phone calls.  Why

3   would I say such a thing?

4           THE COURT:  Ms. Chapman, I will be glad to hear from

5   you in brief rebuttal.

6           MS. CHAPMAN:  Yes, Your Honor.  Thank you.

7           There is a portion of the transcript from the

8   hearing that we have not focused on that I think is important.

9   The transcript is document 109-3, and on page 13 of 48, at

10  line 3 the Court was addressing Mr. Tran, who was then the

11  Defendant's counsel.

12          And the Court states:  "Mr. Tran, where in the

13  docket is there any indication that the request to admit filed

14  by the Plaintiffs have been responded to in any way by the

15  Defendants?"

16          Mr. Tran responded:  "Your Honor, I don't see it on

17  the docket, but I do see, I guess, in our file that there was

18  a response to the request for admissions.  I'm just not

19  certain -- I can't confirm right now how and when it was

20  submitted.  But there were some responses to their request for

21  admissions.  And I have a couple of copies here to see maybe

22  before I got involved if Mr. Anderson's team has received

23  these responses to their RFAs."

24          Then the Court stated:  "Mr. Anderson, have you

25  received any responses to your request to admit?

1          "Mr. Anderson:  Not that I'm aware of, Your Honor.

2    I don't have any in my file."

3          The Court then granted summary judgment which is

4    clear from document 78.  Summary judgment was granted on the

5    basis that there were no responses to the request for

6    admissions.  This is made very clear.

7          It's Your Honor's Order so I feel almost funny

8    saying this.

9          But it's clear from the Order the way that I read

10   it, that the reason summary judgment was granted was based on

11   the mistaken understanding or belief that no responses had

12   been provided.

13         In that Footnote 1 to the Order, the Court found it

14   proper to deem the responses to the document requests timely.

15         And similarly, here, we would request that the Court

16   do the same with regard to the responses to the request for

17   admissions.

18         I don't know why that stipulation in docket 50 was

19   entered into.  I personally called Mr. Tran when I got

20   involved in this case after we cleared conflicts, and I spoke

21   with Mr. DeAntonio's firm, the Bradley law firm.  I called

22   Mr. Tran and I asked him about that stipulation, and why did

23   they enter into that stipulation.  It doesn't seem from my

24   review of all of the discovery responses that had been

25   provided, I do not see a problem with the responses.  There is

1   nothing that is in the opposition to this motion that explains

2   why deficiencies existed in the responses to the

3   interrogatories or request for production.

4          THE COURT:  Well, I think Mr. Anderson has indicated

5   that throughout this litigation that they were unsigned,

6   unidentified, not properly served.

7          MS. CHAPMAN:  And so I looked -- we did the research

8   on that, Your Honor.  This is stated in our reply brief.

9          What we learned from the research that we conducted

10  is that when a discovery response is unsigned, when that is

11  brought to the attention of the litigant or the attorney, that

12  the proper thing to do is to prepare and sign the responses.

13         Which is what I personally did.  I just did this

14  myself.  I looked at the responses.  I saw what they said, and

15  the ones that they were complaining of that had not been

16  signed I had my secretary prepare them on the appropriate form

17  that is customarily used in this jurisdiction, and we served

18  them.  And they are attached to my declaration in support of

19  our reply brief on this motion.

20         So that -- that issue -- and we also have an

21  argument in our reply brief that the name of Mr. Maestre on

22  the cover sheet that accompanied the facsimile, that his name

23  was on there when he was in pro per when these were served,

24  that is good enough to constitute a "signature" for the

25  purposes of Rule 26.

1    But I did not want to leave anything to chance.  And
2  having done the research and read what I'm supposed to do in
3  that circumstance, we then went ahead, like I said, and
4  prepared signed responses.  I didn't change the content of the
5  responses, but I did sign them and served those, and they are
6  in front of the Court.

7    So I respectfully submit that we have cured whatever
8  deficiency existed.  And what remains crystal clear is that
9  the responses were provided.  They were provided on July 23rd,
10  2018, and the mistaken belief that they hadn't been provided
11  is what resulted in summary judgment.

12    And under Rule 60(b) I believe we have met all of
13  the requirements we are supposed to meet.  The motion is
14  timely.  We showed meritorious defense in response to request
15  for admission 36, and the interrogatories that were provided
16  the responses to the interrogatories, and there is no unfair
17  prejudice.

18    In fact, this corrects what had been prejudicial to
19  the Defendant, and I believe it is within the furtherance of
20  justice.

21    There was a mistake.  The mistake resulted in
22  summary judgment.  Rule 60(b) provides a mechanism to correct
23  it.  I believe we met all the requirements under that rule.

24    That turns us then to summary judgment, and why
25  summary judgment should be granted in favor of the Defendant.

1          THE COURT:  Well that -- you addressed that in your
2    opening.
3          MS. CHAPMAN:  Yes.
4          THE COURT:  My rebuttal was for anything -- brief
5    rebuttal for anything new that you needed to respond to.
6          MS. CHAPMAN:  My understanded from when Mr. Anderson
7    was speaking was that he said it was one declaration.  I would
8    just point out there were a number of declarations, including
9    Alma Garcia, Patricia Arguelles, Javier Lopez, and Caesar
10   Torrez, and Luis Maestre.  And all of those declarations
11   provide evidence of priority of use, and there is nothing in
12   the opposition that contests that.
13         So with that, Your Honor, I believe we could submit.
14         THE COURT:  Thank you.
15         MS. CHAPMAN:  Thank you, Your Honor.
16         THE COURT:  There is a lot, Mr. Anderson, about the
17   way you've handled this case that bothers the Court from the
18   beginning to the end, and I am troubled by the event that
19   occurred the day before the preliminary injunction hearing and
20   there are two versions of it.  And the Court wants to get to
21   the bottom of what happened on that day.  Because not only is
22   it troubling in and of itself, but if Ms. Garcia is believed,
23   then there have been misrepresentations to this Court about
24   what happened.
25         And so I have before me an affidavit from Ms. Garcia

1  and responses from Mr. Anderson, both in writing and here in
2  explanation orally.
3        I would like an opportunity to assess the
4  credibility of Ms. Rebecca Garcia.
5        And how soon do you think you can make that happen,
6  Ms. Chapman?
7        MS. CHAPMAN:  We will call her right after the
8  hearing.  I will do everything I can to make it happen as soon
9  as possible.
10       THE COURT:  Can you do it today?
11       MS. CHAPMAN:  Can she come today?
12       THE COURT:  Yes.
13       MS. CHAPMAN:  I can find out.  There is -- I believe
14 there is another lawyer who was helping Mr. Maestre, who is
15 not of record, and she was in contact with this witness.  So I
16 will -- if we could take a break, why don't I call her right
17 now?
18       THE COURT:  I'm going to do that.  I'm going to
19 leave this hearing open and ask the -- what time is it now?
20 11:13.  I will ask you before lunchtime whether you've had any
21 ability to secure the testimony of Ms. Garcia by the end of
22 the day.  And if not, we'll set it at sometime -- we'll set a
23 hearing sometime in the future.
24       MS. CHAPMAN:  So I'm going to tell you today whether
25 she is available to come.

1          THE COURT:  I want to hear her today.

2          MS. CHAPMAN:  Want to hear her today, understood.

3    Yes.  I will go work on that right now.

4          THE COURT:  We're all here.

5          MS. CHAPMAN:  Yes.

6          THE COURT:  This is before me.  I would like to hear

7    her today if possible.

8          MS. CHAPMAN:  I understand.  I will go work on that

9    right now.

10         THE COURT:  All right.  Anything further from either

11   side before we -- I'm going to ask everybody to come back at

12   2:00 and -- but I would like to hear from you as soon as

13   possible with respect to the availability of Ms. Garcia today.

14         MS. CHAPMAN:  We will make a call and come back and

15   report to whomever is here what the status is.

16         THE COURT:  Thank you.

17         MS. CHAPMAN:  Thank you.

18         THE COURT:  Anything further from either side?

19         MR. DeANTONIO:  Your Honor, is there a number that

20   you would like us to call once we hear from Ms. Garcia?

21         THE COURT:  Yes.  You can call the deputy clerk.

22         MR. DeANTONIO:  Okay.  I will get her number.

23         THE COURT:  Get her number, and I will see everybody

24   at 2:00.

25         (The matter is in recess at 11:15.)

1           (The Court reconvened at 2:00.)

2           THE COURT:  Good afternoon.

3           ALL COUNSEL:  Good afternoon, Your Honor.

4           THE COURT:  Ms. Chapman, do you have anything to

5   report with respect to the Rebecca Garcia matter?

6           MR. DeANTONIO:  Yes, Your Honor.  This is Matt

7   DeAntonio.

8           THE COURT:  Yes.

9           MR. DeANTONIO:  I'm happy to report after this

10  morning's proceedings we attempted to contact Ms. Garcia

11  immediately after we adjourned.  We called Ms. Garcia and --

12  her phone number -- her phone was not picking up.  It went

13  straight to some recording.

14          And so the next thing we did was try to contact her

15  through a mutual acquaintance of the Defendants.  And

16  Ms. Garcia -- and through doing that we understand she is at

17  work today, and she doesn't get off until 3:30.  So

18  unfortunately we're unable to produce her for testimony today.

19          So, you know, we understand and appreciate the

20  Court's desire to hear from her directly.  So what we can

21  commit to doing is trying to get back in touch with her later

22  this afternoon and reporting back to the Court as to what she

23  says.

24          Just to be candid with the Court, I think we do have

25  some question as to whether she would ultimately be willing to

1  appear.  And that's just based on what we heard from this

2  mutual acquaintance about her fear -- her fear of coming to

3  court.  Unfortunately, that's just the reality.  And we're

4  doing what we can to produce her.  We will, if she agrees to

5  do it.

6          The only thing I'll add to this is that we attempted

7  with the declarations to provide some contemporaneous accounts

8  on what happened beyond just the written testimony.

9          THE COURT:  Yes.  You don't have to go into a

10  substantive analysis.  I do have what I have in front of me,

11  and I can make rulings based upon what I have.

12          I just thought it would be a stronger record to

13  actually hear from -- I heard from Mr. Anderson, but to hear

14  from the other participant in the interaction.

15          So I think what I will do is hold this open, and my

16  thought was to hold it open until March 27th.  And between now

17  and March 27th if you can procure the attendance of Ms. Garcia

18  to give live testimony here, we'll schedule that.

19          In doing so I would expect the attorneys to work on

20  possible agreeable dates.  So in other words, if you talk to

21  Ms. Garcia and you find out from her when she's available, try

22  as best you can to coordinate with opposing counsel to an

23  agreeable date, and opposing counsel can be here to

24  cross-examine, can participate by phone or waive appearance.

25  It doesn't matter to me.  But let's try to get that done

1   between now and March 27th.

2          You may come back to me and say she's just not

3   willing to get involved, doesn't want to testify, may come

4   back and say that there are dates that she's available to do

5   it but defense counsel is not available.  We'll just take

6   those one at a time.

7          Mr. Anderson.

8          MR. ANDERSON:  Yes.  I will not be waiving or

9   walking away from this.  I do intend to cross-examine --

10         THE COURT:  I'm not sure I'm going to let you

11  cross-examine.  I might have Mr. Allan cross-examine.  I think

12  there is sufficient evidence in the record that would call

13  into question the fairness of you examining her, but we'll

14  cross that bridge at a later date.

15         So maybe the best thing for you to do, Mr. Anderson,

16  before leaving here today, is provide a list of available

17  dates that you might have, and we'll see if that coordinates

18  with the witness.

19         MS. CHAPMAN:  Your Honor, may I ask a question?

20         THE COURT:  Yes.

21         MS. CHAPMAN:  I would request that the Court enter

22  an order prohibiting Mr. Anderson from contacting the witness.

23         Mr. Albert Allan can do that but I don't think it is

24  appropriate --

25         THE COURT:  Yes.  I will do that.  I will do that

1   orally.  There's enough evidence in the record of

2   Mr. Anderson's unprofessional conduct in the first instance to

3   justify such an order.  There's a photograph that you don't

4   deny and that's sufficient for me.

5           MR. ANDERSON:  Your Honor, a photograph of flipping

6   the bird at someone is not a threat and --

7           THE COURT:  We're not arguing that right now but it

8   is sufficient for me to enter an oral directive to you not to

9   have contact with Ms. Garcia.

10          MR. ANDERSON:  Okay.  Can the Court provide us with

11  some information about this so call Rebecca Vadal Garcia.  We

12  have no way of contacting her.  We don't know who she is.

13          THE COURT:  Well, good, so then it won't be a

14  problem.  You are directed not to contact her.

15          MR. ANDERSON:  But we have the right to conduct

16  discovery into the allegations that have been made.

17          THE COURT:  She has submitted an affidavit.  I have

18  expressed an interest in hearing from her with live testimony,

19  and so that's what we're trying to schedule.  There is no

20  other discovery issue involved in this at this point.

21          She submitted an affidavit.  I have heard from you,

22  and I have expressed a desire to hear from her in person, and

23  that's what we will arrange.

24          So -- so that's what you should do, Mr. Anderson.

25  You should give defense counsel a list of dates between now

1  and March 27th which you might be available.  And then defense

2  counsel should coordinate with Ms. Garcia and inform the Court

3  as to the dates that are possible for her testimony.

4           So let me see if there is anything else that we need

5  to discuss?

6           There was a conflict in the evidence presented to me

7  with respect to the outside-the-courtroom interaction between

8  Mr. Anderson and the Defendants.  And I had meant to come back

9  to Ms. Chapman and see where that stood with respect to --

10 there's a significant difference in the Court's mind with

11 respect to the timing of that encounter.

12          Are you -- is there anything about what you heard,

13 Ms. Chapman, that would change your position as to whether it

14 occurred before the hearing or after the hearing?

15          MR. DeANTONIO:  Your Honor, we conferred with

16 Mr. Maestre during the break and confirmed with him that

17 according to us this happened before the Court hearing that

18 day.  So no change in our view.

19          THE COURT:  Then I would like to hear that

20 testimony.  I would like to hear testimony, as long as we're

21 doing it, I would like to hear testimony from Mr -- is it

22 Maestre?  Is that --

23          MR. DeANTONIO:  Maestre.

24          THE COURT:  Say it again.

25          MR. DeANTONIO:  Maestre.

1            THE COURT:  Maestre.

2            MR. DeANTONIO:  That's good.

3            THE COURT:  I would like to hear testimony on that,

4    as well as the telephone call interaction that is in his

5    affidavit.

6            MR. DeANTONIO:  Sure.  So that we can prepare for

7    that testimony.

8            THE COURT:  Let's do it right now.

9            MR. DeANTONIO:  I'll do it right now.

10            THE COURT:  Yes.

11            MR. DeANTONIO:  Okay.  Can you give us one second to

12    explain to him?

13            THE COURT:  Yes.

14            Before we get to that, for counsel's information, I

15    have said between now and March 27th with respect to

16    Ms. Garcia, except for March 12th, March 26th, or March 15th

17    through the 18th.

18                 LUIS MAESTRE, Defendant WITNESS, SWORN

19                        DIRECT EXAMINATION

20    BY MS. CHAPMAN:

21    Q.  Good afternoon, Mr. Maestre.

22        Will you please tell the Court about interactions you

23    have had with Mr. Anderson in the courtroom or outside of the

24    courtroom?

25            THE COURT:  And, I'm sorry.  Both of you are out of

1   district.  We have a very strange custom here that when you're

2   addressing the Court you stand, when you're addressing a

3   witness you sit.

4           And so as awkward as that can be for out of district

5   counsel that's the policy here.

6           MS. CHAPMAN:  Thank you.  For the clarification.

7   It's interesting.

8   Q.   I'll start again.

9        Mr. Maestre, can you please tell the Court about

10  interactions you have had with Mr. Anderson in this courthouse

11  outside the courtroom?

12  A.   Yes.  Yes.

13  Q.   Please tell His Honor about that.

14  A.   So, Your Honor, when the first time that we came over

15  here to court, Anderson got up and he met us before we came

16  inside the courtroom.  When he saw my wife he said, "Oh I

17  already know who you are.  And the one that I haven't had the

18  pleasure of meeting or seeing is you.  I want to see your ID."

19       And I asked, "Why am I going to show you my ID?"

20       And he said, "Don't make things difficult.  If you don't

21  show me your ID, the Court is not going to be able to

22  proceed."

23       So he obligated me to hand him my ID.  He took my ID,

24  placed it in his hand, and I was surprised that without asking

25  for my permission he took my ID, and he took a picture of it

1  with his phone.

2       And I asked him, "Why did you take a picture?"

3       He said, "Shut up," and that's it.

4  Q.   Was Mr. Anderson speaking in English or Spanish?

5  A.   He was speaking Spanish.  He speaks Spanish at

6  100 percent.

7  Q.   You indicated that this happened the first time you came

8  to court.  Do you have an understanding of the purpose of the

9  court proceeding on that day?

10 A.   That I needed to show up in court because of the suit

11 that he had filed against me.

12 Q.   Do you have any understanding of the nature of the

13 proceedings that day?

14 A.   I was very confused.  I thought it was like when you show

15 up to traffic court or something, to pay a ticket or

16 something.  I didn't know because I didn't have an attorney at

17 the time.

18 Q.   Do you remember the date that this incident occurred?

19 A.   Yes.  It was June 1, 2018.  It's impossible for me to

20 forget that day because the day before he showed up to

21 intimidate me.  And I came to court and I was very nervous.

22 Q.   You testified that this discussion with your

23 identification happened before the Court hearing.  Are you

24 sure about that?

25 A.   I'm sure -- so I'm sure that it happened before the

1   actual proceeding.  It wasn't in this courtroom in particular,

2   it was in another courtroom.  When we walked in, he got up,

3   and he met my wife and I, like, halfway down the hallway.

4           MS. CHAPMAN:  May I move on to the next incident,

5   Your Honor, or does Your Honor have any follow-up?

6           THE COURT:  I don't have any questions.

7           MS. CHAPMAN:  Okay.

8   Q.   Mr. Maestre, did you ever come to court in connection

9   with this case on another occasion?

10  A.   Yes.  I've been here before on another occasion.  So that

11  was the first time that I came to court that date that I told

12  you about the picture but prior to that I hadn't been to

13  court.

14  Q.   I'm sorry.  Did Mr. Anderson ever call your personal cell

15  phone at any time?

16  A.   Yes.

17  Q.   How many times?

18  A.   I would say on about three occasions.

19  Q.   Can you tell us about each telephone call, please?

20  A.   I remember that one of the times was after the Judge had

21  ruled after the hearing, and it had to do with the fact that I

22  needed to turn over their -- the domains, and that I had to

23  pay the money.

24          So I told him, "Anderson, look, you can contact Go Daddy.

25  They're ready to hand over the domains."

1        And then he also mentioned that "If you don't cooperate

2   in regards to the payment of the money then I'm going to have

3   them issue an order for your arrest, and I'm gonna tell the

4   judge to arrest or send you to jail, both you and your wife."

5        And so there was another call that it had to do with

6   Mocachica.  And he said that, you know, "I know that you have

7   something to do with Mocachica."  And where he threatened to

8   burn down both of the businesses that he alleged I had.

9            MR. ANDERSON:  Objection.  Hearsay, motion to

10  strike.

11           MS. CHAPMAN:  Mr. Maestre --

12           THE COURT:  Hang on a second.  Objection overruled.

13  Q.   I am asking you about conversations you had with

14  Mr. Anderson on the telephone, and I would like you to limit

15  your testimony to explaining to the Court conversations you

16  had with Mr. Anderson on the cell phone.

17  A.   Yeah.  So this conversation via the cell phone was in

18  Spanish.  So he was demanding that I hand over or turn over

19  the domains, and that I come up with the money.  That if I

20  didn't listen to him that he was going to call me into court.

21  That he was going to talk to the judge to issue, like a, an

22  arrest warrant, and for myself and my wife to be arrested.

23           THE COURT:  So is what you just testified about the

24  Mocachica and burning down the building, that wasn't in a

25  telephone conversation?

1          THE WITNESS:  So the last conversation that I had

2    with Anderson was regarding that.  But then the conversation

3    before that was a conversation that alluded to the fact that I

4    wasn't hurrying up to hand over certain things.  He said, "I'm

5    gonna burn Mocachica and Michoacana."

6          Any time that my phone would ring and I would see

7    that it was Anderson, it was just to intimidate me and to

8    threaten me.

9          THE COURT:  So you're saying this happened in a

10   phone conversation that he talked to you about burning the

11   building down?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  The last conversation you had with him

14   on the phone?

15         THE WITNESS:  The last conversation that I had with

16   him was over the phone, and it was regarding turning over the

17   domains, and to pay him the money.

18         THE COURT:  So did this conversation that you allege

19   you had with Mr. Anderson over the phone concerning burning

20   down the building, did that occur before my order or

21   afterwards?

22         THE WITNESS:  Before.

23         MS. CHAPMAN:  I have nothing further, Your Honor.

24         THE COURT:  Any cross?

25         There's no need for hysterics or sighing or other

1    demonstrative.

2              MR. ANDERSON:  I'm sorry?

3              THE COURT:  There's no need for demonstrative

4    sighing.  You can ask questions but limit yourself to that.

5                          CROSS-EXAMINATION

6    BY MR. ANDERSON:

7    Q.   Sir, what is your cell phone number?

8    A.   704-614-0046.

9              THE COURT:  All right.  So if you sigh again Mr.

10   Allan will be conducting the rest of the conversation.  You're

11   there to respectfully ask questions of this witness.  You may

12   cross-examine but no demonstrative sighing.

13             MR. ANDERSON:  Again, I apologize.  It was not

14   demonstrative --

15             THE COURT:  Just don't do it.

16   Q.   Sir, how many times have you called my cell phone number?

17   A.   I've called his office -- I don't know if that's his cell

18   phone or his office, but -- so I would ask for Mr. Anderson.

19   Sometimes they would say he wasn't there, sometimes he would

20   answer.

21   Q.   So you never called my cell phone number, is that what

22   your testimony is?

23   A.   I dialed the number.  I don't know if it is his personal

24   cell or the office number.  So I'm not really sure if it's his

25   or the office's.

1   Q.   How many times have you called me?

2   A.   Five or six, but I don't recall exactly how many times.

3   Q.   Five or six times during the duration of this case is the

4   only amount of times that you believe you called me?

5   A.   I don't recall the exact amount of times that I've

6   called.

7   Q.   Now you allege that I had said something about burning

8   down a building.  When and what was the context of that?

9   A.   Prior to the last court.  And Mr. Anderson, I don't know

10  if it's bad what I'm about to say, but I'm going to say it.

11       Based on the threats that I received, I downloaded a

12  program that recorded all my conversations with Anderson.  I'm

13  going to try to contact the company to see if I can retrieve

14  those because I lost the cell phone where I had those

15  recordings.  I think if I called the company they can retrieve

16  those calls and place them on my new cell phone.

17       When you would tell me if you are a friend of my -- if

18  you're friends with my friends, or you're an enemy with my

19  friends, I should say, then you're my enemy.  If you want a

20  war, I'll give you a war.  Do you remember that?

21            THE COURT:  All right.

22            MR. ANDERSON:  Motion to strike, Your Honor;

23  nonresponsive.

24            THE COURT:  I'll deny the motion.  But I'll tell

25  Mr. Maestre, you're here to answer questions not to make any

1   statements.  So listen to the question asked and answer that
2   question.
3                   THE WITNESS:  Sorry.
4   Q.   Now, you indicated that our discussions were all in
5   Spanish and that you believe that I'm 100 percent fluent in
6   Spanish; is that correct?
7                   MS. CHAPMAN:  Objection; object to the form.
8                   THE COURT:  I'll sustain the objection as to form.
9   Q.   Sir, when you spoke to me, did you speak to me in English
10  or in Spanish?
11  A.   So I spoke to you in Spanish because when I tried to
12  speak to you in English, you would indicate or you would tell
13  me that you didn't understand to speak to me in Spanish.
14  Q.   And I spoke to you in Spanish is your testimony?
15  A.   All calls that you made to me, Anderson, were in Spanish.
16  Sometimes I would speak -- try to speak in English, but then
17  he would tell me that he didn't understand.
18       But Anderson speaks Spanish very well.
19  Q.   Now, sir, in your declaration that you submitted to the
20  Court, did you write anything in there about me stating that I
21  was going to burn down some building?
22  A.   I tried to explain that in court, but I didn't write
23  anything down.
24  Q.   This declaration that you signed, Document 116, it's 13
25  pages.  You did this in English and in Spanish.

1          MS. CHAPMAN:  Object to the form.

2          THE COURT:  I don't know that there's a question.

3          MS. CHAPMAN:  Yeah.

4    Q.    Sir, do you remember signing a declaration in November, a

5    few months ago, that was written by this counsel for you?

6          MS. CHAPMAN:  Object to the form.

7          THE COURT:  I'll sustain as to the form.

8          Do you intend do show him his declaration?

9          MR. ANDERSON:  I only have the English version with

10   me, and it's not signed.

11         THE COURT:  We can -- let's printout a copy of the

12   declarations.

13         MR. ANDERSON:  Maybe I can just ask the ultimate

14   question.

15         THE COURT:  Sure.

16   Q.    Sir, isn't it true --

17         THE COURT:  Go ahead and sit down.

18   Q.    -- that your declaration you submitted to this Court

19   makes no reference to any alleged statement where I said

20   anything about burning buildings?

21   A.    I didn't -- I didn't write it down on there.  But I did

22   want to express that verbally in court.  And I did mention

23   that to the Court of the threats that were made to

24   Ms. Rebecca.

25         THE COURT:  It's a simple question.  The question

1   is:  "Did you put that threat in your declaration?"  Yes or
2   no?
3                THE WITNESS:  I don't recall.
4   Q.   Now that's the kind of thing that would be important to
5   put in a declaration, isn't it?
6   A.   I don't -- I don't know -- I wanted to say in my own
7   words here in court.
8   Q.   Do you know the date that we last spoke?
9   A.   I don't remember the last time.  I remember the last
10  conversation where you threatened me and that you were gonna
11  send me to jail.  Another call Anderson made asking me about
12  certain personal --
13               THE COURT:  No, no, wait.  Mr. Maestre, you're there
14  to answer questions not TO give speeches.
15               So the last question was:  "Do you remember the date
16  that we last spoke?"  Do you remember that or not?
17               THE WITNESS:  I don't remember.
18               THE COURT:  All right.  Next question.
19  Q.   Do you recall a time when I asked you if you had put a
20  freezer into your store called Raspados Jalisco that had La
21  Michoacana products in it?
22               MS. CHAPMAN:  Object to the form.  Outside of the
23  scope.
24               THE COURT:  What's the relevance of that question?
25               MR. ANDERSON:  Your Honor, I have a declaration here

1   in the file.  It's called "Declaration of Stephen Anderson in

2   Support of Application for Court Order to Show Cause."  It has

3   extensive description of telephone call on July 18, 2019, and

4   the context of that discussion and what was said.  That would

5   be part of the contempt motion, I suspect.

6            I don't have a number on this printout here.  But

7   let me just see, signed 22nd of July, '19.

8            THE COURT:  So ask him about that date and see where

9   we get with that.

10  Q.   (By Mr. Anderson) I have the date -- do you know if you

11  spoke to me on July 18, Mr. Maestre?

12  A.   Yes, I did speak with you on July 18th.

13  Q.   How come you remember that date?

14  A.   So you're talking about a conversation June 18, if I

15  remember -- you talked to me about some freezers.  I'm not

16  100 percent sure whether it was June 18th or not.  Okay.  So

17  let's suppose for the sake of argument that it was June 18th.

18  What happened?

19  Q.   It was July 18th is the question.

20       Now, do you remember speaking to me on or around July of

21  2019 about a store called Raspados Jalisco?

22            MS. CHAPMAN:  Objection.

23            THE COURT:  Overruled.  Let's see where it goes.

24            THE WITNESS:  I remember that he asked me about

25  Raspados Jalisco, Alechie (phonetic spelling), Compare Foods,

 1  regard some stores that had some freezers.  And I told him,

 2  "Well, go talk to the owners of those businesses because I

 3  don't know why they're there."

 4  Q.   Okay.  Do you remember that after the Court issued an

 5  Order that photographs of bunkers, ice cream freezers, and ice

 6  cream was in your store called "La Michoacana"?

 7  A.   So I remember the Court Order about, you know,

 8  specifically, that I was not supposed to have those products

 9  there.  But he assumes that these freezers that are like in

10  200 stores across North Carolina are mine.

11  Q.   Did you have a freezer in your store called "La

12  Michoacana" in which you were enjoined from putting it there

13  in July of 2019?

14  A.   I don't recall putting anything in La Michoacana.  I

15  obeyed the instructions from the Judge, and I think that the

16  Court has records that I removed everything that have to do

17  with La Michoacana.

18       What I have noticed is that there are a lot of other

19  businesses that have those freezers.  It could be like

20  markets, Walmarts, CVS --

21  Q.   Let me make this very clear.  Are you saying that after

22  the Judge issued his summary judgment order that you did not

23  take a bunker from PLM and put it in your store with ice cream

24  in it?

25  A.   I didn't never authorized anyone to put any apparatus,

1    any freezer in the store.  I haven't signed any documents that

2    indicate that Luis Maestre is authorizing to put these in any

3    business.

4        So I'm just following the Court Orders.  And I just, you

5    know, kept separate and apart, and I make sure I obey.

6    Q.   Was there an ice cream bunker marked "La Michoacana" in

7    your store in July 2019?  July, sir.

8            INTERPRETER:   (Repeating in Spanish.)

9            THE WITNESS:  Not that I'm aware of.  I had nothing

10   to do with that.

11   Q.   Did you open a store called "Raspados Jalisco" of 50 --

12   5015 North Tryon?

13           THE COURT:  Mr. Anderson, I think this is way beyond

14   the scope of direct.

15           MR. ANDERSON:  Sir, it goes to the discussion that

16   we were having that day.

17           THE COURT:  You can ask him about a discussion on a

18   phone, if you wish, but this goes beyond the scope of direct.

19   Q.   Did I ask --

20           THE COURT:  The question you asked is what he had in

21   the store, not what was discussed on the phone.  If you want

22   to ask him about discussions on the phone --

23           MR. ANDERSON:  That's what I'm trying to get to.

24           THE COURT:  Well, you're not getting to it.  You're

25   getting away from it.

1  Q.    (By Mr. Anderson) During our last discussion, did you say

2  in English, that if you have ice cream in the store or it's

3  being sold that I need to speak to PIM about it?

4          MS. CHAPMAN:  Object to the form.  Outside the

5  scope.

6          THE COURT:  Overruled.

7          THE WITNESS:  I don't know.

8  Q.    Did you tell me, you don't own the name.  You can't do

9  anything to me.  I have no money.

10  A.    That's a lie Anderson.  I never told you that.

11  Q.    Did you tell me you got to talk to the new owner of the

12  business.  That you were not the owner of the business?

13  A.    So I told him that I was not the owner of all these

14  businesses that he was saying where he saw all these freezers.

15  Q.    Did I ask you if you were intending to comply with the

16  judgment to stop selling ice cream, and you indicated that you

17  refused to sell -- stop selling ice cream featuring the La

18  Michoacana marks as everyone else was doing it?

19  A.    So what I told him is, "Anderson, I don't know what

20  you're talking about.  I know that there's a lot of businesses

21  that have these refrigerators.  I don't know anything about

22  it."

23          He started to get upset.  I told him stop calling me

24  again regarding this because you're starting to get mad.  And

25  I think he stopped calling me after that.

1  Q.   Did you indicate, "Mr. Anderson, I don't care.  You can't

2  do nothing to me"?

3  A.   That's false.  You've caused a lot of hardship to me.

4  Q.   Did you call me back after that discussion or was that

5  it?  We had one talk that day and that was it?

6          MS. CHAPMAN:  Object to the question.

7          THE WITNESS:  I don't remember.

8          THE COURT:  Overruled.

9  Q.   Did I ask you if you were familiar with Leticia Adan?

10 A.   I don't remember.

11 Q.   Now, in your declaration that you submitted to court, did

12 you indicate that you had taken down all of the signage and

13 that you weren't using Michoacana anymore?

14 A.   Yes.  I removed everything.  I was complying to with what

15 the Court ordered.  Even before the Judge issued the Order, I

16 had already removed the signs from the business in Concord.

17 Q.   So is it your contention that in July of 2019 there was

18 no freezer bunker in your store that had the Michoacana and

19 design on it?

20 A.   As far as I can recall, no.  I haven't signed any

21 authorization for any company to install anything with La

22 Michoacana.

23 Q.   Is there someone else in charge of that business other

24 than you?

25 A.   Female workers are there.

1  Q.   Did one of the female workers install bunkers with

2  freezers and ice cream in it in your store?

3  A.   I don't think they've done it.

4          THE COURT:  So we're on cross with respect to direct

5  testimony on the telephone call interaction and the courthouse

6  interaction.  If you have any further questions on those two

7  things you may ask him.  But we're not here on any other

8  substantive issues.

9          I guess what I'm saying is, I've let you go pretty

10  far afield talking about compliance or non-compliance with the

11  summary judgment order, but that's not the scope of direct.

12          MR. ANDERSON:  I would ask that we suspend further

13  cross until the conclusion of the next hearing.  I would like

14  to put on Rigoberto Fernandez at this time.

15          THE COURT:  Do you have any other questions for this

16  witness at this time?

17          MR. ANDERSON:  Not that I'm prepared to deal with

18  because this came up real quick.

19          THE COURT:  Right.

20          MR. ANDERSON:  What I need to get is the cell phone

21  records --

22          THE COURT:  If you're talking to me stand up.

23          MR. ANDERSON:  I need to get the cell phone records

24  of when he called me and when I called him.  I need to get the

25  documents that I can cross-examine him with, with respect

1   to --

2           THE COURT:  Do you have any other questions of this

3   witness at this time?

4           MR. ANDERSON:  Not at this time.

5           THE COURT:  Very well.

6           Mr. Maestre, you may step down.

7           All right.  We've talked about the -- Mr. Maestre's

8   testimony.  We talked about procuring Ms. Garcia's testimony,

9   and I've given you, Ms. Chapman, until March 27th to schedule

10  with the Court Clerk a time for that.

11          MS. CHAPMAN:  Yes, Your Honor.

12          THE COURT:  If that can't be done, then I will deal

13  with the issues on the record before me.

14          Mr. Anderson, I'll give you the same time period to

15  file any telephone cell phone records you wish to file between

16  now and March 27th.

17          I don't know that I have anything else in front of

18  me except for Mr. Allan's motion to withdraw.

19          Do you care to be heard on that or submit anything?

20          MR. ALLAN:  Your Honor, if you need detail, as

21  indicated in the motion, I prefer to do that in camera

22  affidavit to preserve attorney-client privilege.

23          THE COURT:  All right.  If you would do that.

24          MR. ALLAN:  Yes, sir.

25          THE COURT:  Is there anything else?

1          MS. CHAPMAN:  No, Your Honor.

2          MR. ANDERSON:  Yes, Your Honor.  I'm prepared to

3     testify, and I also would like to call Rigoberto Fernandez

4     concerning the allegations that Mr. Maestre's made.

5          THE COURT:  All right.  So I've heard from you, both

6     in written form and in arguments to the Court.

7          MR. ANDERSON:  But not as rebuttal to the testimony,

8     sir --

9          THE COURT:  If you're talking to me -- if you're

10    talking to me, stand up and respect the Court that you're

11    talking to.

12         I wanted to hear from Mr. Maestre personally because

13    I have not heard from him.  I have heard from you.  And so if

14    you would proffer to me what else you wish to testify about

15    that I haven't heard from you, I will be glad to hear from

16    you.

17         MR. ANDERSON:  That I can demonstrate that he has

18    testified falsely, repeatedly throughout this case and just a

19    few minutes ago.  And again, I can prove it.

20         THE COURT:  I don't know what that means.  I mean,

21    you have proffered to the Court facts that I've listened to.

22    And so I'm saying, what further evidence do you wish to

23    present to the Court on the issue before the Court?  Not

24    whether Mr. Maestre has --

25         MR. ANDERSON:  His credibility is in question, sir.

1          THE COURT:  It is in question.  I've given you ample

2  opportunity to explore that.

3          MR. ANDERSON:  And again, explore means to provide

4  refuting evidence, not just simply ask a few simple questions.

5          I don't watch much Perry Mason, but I've never seen

6  someone admit from the stand:  "Yes, you just got me.  I've

7  lied" and everything goes out the window.

8          See, the process is determining credibility by

9  comparison.

10          THE COURT:  Thank you for explaining to the Court

11  the process.  It's a very helpful thing for you to do.

12          This is not my first rodeo either, Mr. Anderson.

13          And I have been more than patient --

14          MR. ANDERSON:  I --

15          THE COURT:  Sit down.

16          I've been more than patient with your obstructive

17  conduct, your interrupting the Court, your badgering of

18  witnesses.  I've given you more than ample opportunity to

19  cross-examine Mr. Maestre.  I don't think any further evidence

20  is necessary on that point.

21          So, Ms. Chapman, I will wait to hear from you on

22  Ms. Garcia.

23          And we're concluded for the day.

24          MS. CHAPMAN:  Yes, Your Honor.  Thank you.

25          THE COURT:  Thank you.

1          MR. DeANTONIO:  I have a question, Your Honor.
2     Would you like us to reach out to the courtroom deputy about
3     what we hear from Ms. Garcia?
4          THE COURT:  Yes.
5          Mr. Allan, I'll take your motion under advisement,
6     and when I receive your in-camera submission I will be able to
7     rule on it.
8          MR. ALLAN:  Yes, Your Honor.
9          THE COURT:  Very well.
10          (The matter is concluded at 2:56.)
11                    * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF NORTH CAROLINA
2  CERTIFICATE OF OFFICIAL REPORTER

3          I, Laura Andersen, Federal Official Court Reporter,

4  in and for the United States District Court for the Western

5  District of North Carolina, do hereby certify that pursuant to

6  Section 753, Title 28, United States Code that the foregoing

7  is a true and correct transcript of the stenographically

8  reported proceedings held in the above-entitled matter and

9  that the transcript page format is in conformance with the

10 regulations of the Judicial Conference of the United States.

11
           Dated this the 4th day of March 2020.
12

13
                    S/Laura Andersen
14                  Laura Andersen, RMR
                    Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25